WOLVERINE BRASS WORKS v. SOUTHERN PACIFIC CO.

1. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — COMMERCE — OVERCHARGE—JURISDICTION.

In an action by a shipper to recover back an amount paid as freight in excess of the lawful charge, the State court had jurisdiction to determine the right of recovery under 24 U. S. Stat. 387, and whether an overcharge in excess of the published rates had been made.[1]

2. SAME—EVIDENCE.

In an action to recover an overcharge from defendant railroad company on the ground that the shipment was one of brass goods, subject to a lower rate than that collected (for supplies of plumbers), a decision or opinion of the interstate commerce commission that the shipment of wastes and overflows, together with other plumber supplies ·in a single package, rendered applicable the rate of the highest rated article in the box, was not controlling and was properly rejected as irrelevant.

Error to Kent; McDonald, J. Submitted April 26, 1915. (Docket No. 102.) Decided July 23, 1915.

[1] As to power of State court to pass. on interstate rates, see note in 28 L. R. A. (N. S.) 108.

Assumpsit by the Wolverine Brass Works against the Southern Pacific Company for the recovery of an overcharge. Judgment for plaintiff. Defendant brings error. Affirmed.

*Wilson & Johnson,* for appellant.

*Rolland J. Cleland* (*Henry T. Heald,* of counsel), for appellee.

MOORE, J. This suit was commenced in justice's court. It was appealed to the circuit court. The action was brought against the Southern Pacific Company to recover back a portion of certain freight charges paid by the plaintiff on certain shipments of freight. The plaintiff placed one construction upon the published tariffs, which, if correct, would entitle it to the rate of $1.75 per 100 pounds. The defendant placed another construction upon the tariffs, which, if correct, would require a rate of $2.60 per 100 pounds. The defendant charged and collected from the plaintiff the $2.60 rate, and this action is to recover the difference between the two rates on the shipments made by the plaintiff. The jury returned a verdict for the plaintiff in the sum of $312, and the case is brought to this court by the defendant on a writ of error.

The merchandise was delivered to the Grand Trunk Railroad Company, and by the Grand Trunk Railroad Company and intermediate railroads delivered to the Southern Pacific Company, the defendant, who made the delivery to the consignee. The Wolverine Brass Works prepaid the freight at the rate of $1.75 per 100 pounds, being the tariff rate for freight moving from Grand Rapids to San Francisco applicable to "Valves and Fittings N. O. S. boxed." At San Francisco the inspector reclassified the merchandise and the Southern Pacific Company collected the difference between $2.60 per hundred pounds and $1.75 per hundred pounds.

The tariff and classifications governing charges to be made by carriers for the transportation of merchandise between Grand Rapids and San Francisco had been duly published and filed according to law at the time the shipment was made. In one of the tariffs there appears the following: "Plumbers' Supplies, Plumbers' Supplies N. O. S. in boxes and casks, second class." The rate under this classification was $2.60, and was the rate which the railroad sought to charge.

There was also in force and effect at the time a published tariff known as the "Transcontinental West-Bound Tariff 1—G" as follows: "Brass Goods Not Silver Plated O. R. Wet and Corrosion. Valves and fittings N. O. S. boxed $1.75." It was at this rate that the plaintiff paid the freight. In railroad tariffs the letters N. O. S. mean "Not otherwise specified."

At the time the shipments were made two rules and conditions of freight tariffs were in force and effect as follows:

I. That the shipper is entitled to the lowest rate contained in the printed tariff which is properly applicable to the articles shipped.

II. That when several articles are shipped in one box the rate which is applicable is that applicable to the highest rated article in the box.

The plaintiff does not contend that the goods shipped might not have been properly classified under either head, but it does contend that under the tariff issued and published it was entitled to the lowest published rate, which was $1.75.

1. The first assignment of error is based on the court's refusal to grant the defendant's motion to dismiss. The ground of defendant's motion was that a State court has no jurisdiction of the subject-matter involved in the claim of the plaintiff for the following reasons:

(*a*) That it is a matter primarily and exclusively

within the jurisdiction of the interstate commerce commission.

(*b*) That since the commodities shipped were not specially mentioned in the tariffs under the names "wastes and overflows" and "traps," the question of the proper classification of such articles is administrative in its character and calls for the exercise of the powers and discretion conferred by congress upon the interstate commerce commission.

(*c*) The jurisdiction of the courts in such a matter would be inconsistent with the enforcement and purpose of the interstate commerce act, for plaintiff had not, prior to this suit, filed a complaint with the interstate commerce commission or obtained an order from said commission for reparation by reason of said alleged overcharge.

(*d*) Plaintiff's claim is really based on an alleged violation by the defendant of one of the provisions of the interstate commerce act, to wit, that no higher rate should be charged than that stated in the tariff schedules, and of such a matter a State court has no jurisdiction, as the interstate commerce act gives jurisdiction to the interstate commerce commission or the federal courts for any violation of the interstate commerce act.

2. The defendant's second assignment of error is based on the court's refusal to receive in evidence a certified copy of a decision or report of the interstate commerce commission, which report was made in another case.

1. The first assignment of error is argued at great length in the brief, and was also argued orally, counsel quoting freely from the interstate commerce act, known as the Hepburn act, and citing *Texas, etc., R. Co.* v. *Oil Co.*, 204 U. S. 426 (27 Sup. Ct. 350, 9 Am. & Eng. Ann. Cas. 1075) ; *Texas, etc., R. Co.* v. *Tie & Lumber Co.*, 234 U. S. 138 (34 Sup. Ct. 885) ; *Robinson* v. *Railroad Co.*, 222 U. S. 506 (32 Sup. Ct. 114) ; and other cases. The argument of counsel is, we quote from the brief:

"The purpose of the interstate commerce act was to

establish uniformity of rates and to prevent discrimi-
nation in interstate shipments. The agency established
for carrying out this purpose is the interstate com-
merce commission. To open this jurisdiction to the
courts would, in the language of the *Oil Co. Case,* 'be
the absolute destruction of the act and the remedial
provisions which it created.' 'For if, without previous
action by the commission, courts assume jurisdiction of
such matters, it would result that unless all courts
reached an identical conclusion a uniform standard of
rates in the future would be impossible, as they would
fluctuate and vary, dependent upon the divergent con-
clusions reached' as to the proper classification of cer-
tain commodities, at least in cases where there was am-
biguity or doubt as to the meaning of the terms con-
tained in the published tariffs. 'Indeed, to permit
courts to do so would be wholly inconsistent with the
administrative power conferred upon the commission.'
It would result in one rule in one jurisdiction and a
different rule in another jurisdiction and 'give rise to
confusion, create unjust preferences, frustrate the pur-
pose of the interstate commerce act and cause the act
to destroy itself.' "

A reference to the cases cited by appellant will show
them to be distinguishable from the instant case. In
the present case the tariffs which should be controlling
were duly published and filed. There was no question
of the reasonableness of the rates filed therein. There
was no claim that an application of them would be
discriminatory.

Section 22 of the interstate commerce act (25 U. S.
Stat. 862) reads:

"* * * And nothing in this act contained shall
in any way abridge or alter the remedies now existing
at common law or by statute, but the provisions of this
act are in addition to such remedies."

The case of *Gimbel Brothers* v. *Barrett* (D. C.), 215
Fed. 1004, is especially interesting, as it refers to some
of the cases upon which appellant places great reliance.
We quote:

"The impression first received upon the reading of the act (Interstate Commerce Act) is that the tribunal, whose powers may be invoked to redress the injury, is optional with the complainant. * * * A fuller consideration of the acts, however, soon discloses that certain of their remedial features are made subordinate to the administrative powers conferred, and the remedies afforded do not become effective or cannot be applied except through or until after the exercise of these administrative powers, which are conferred, not upon the courts, but upon the commission. This makes necessary that in such cases the appeal of the person injured be made, or at least be first made, to the commission. This necessity arises, not because of a lack of jurisdiction, strictly speaking, in the courts, but because some facts upon which the judgment of the courts must be based can only be made to appear from the exercise of these administrative powers. To construe the acts as conferring these administrative powers upon the courts would not only work practical confusion, in that the results would vary in different jurisdictions and even in different cases, but such a construction would make the act self-destructive. This is the basis of the ruling in every one of the cases to which we have been referred. For illustration, in *Texas, etc., R. Co.* v. *Oil Co.*, 204 U. S. 426 [27 Sup. Ct. 350, 9 Am. & Eng. Ann. Cas. 1075], the carrier there had published its tariff or schedule of charges. The complaint was that these rates were unreasonable, and the right of action was based upon a finding to this effect. To render judgment against the carrier with the schedules in force involved this incongruity. The act required the carrier to file its tariff. It further required it to adhere to it when filed and to strictly observe it as filed. This is its plain meaning. How, then, could it be construed to also mean that the carrier was bound to depart from the published rates? This and the practical difficulties in the way of any other construction of the act compelled the construction that the determination of the proper rate, or what the rate should be, or, in other words, the fixing of the rate, was committed to the commission and to the commission alone as an administrative act.

"The latest case on the subject to which we have

been referred, that of *Texas, etc., R. Co.* v. *Tie Co.*, 234 U. S. 138 [34 Sup. Ct. 885], affords another illustration of the same distinction. There the complaint was the refusal of the railroad to transport ties in pursuance of an alleged purpose to limit their sale market. The objection to any action by the court was that no rates for ties had been filed by the carrier, and, in consequence, no charge could be made for such service. There was a rate for lumber, and the question was whether this applied to ties. The court held this question 'was one to be primarily determined by the commission' in the exercise of the powers conferred upon it by Congress, because the real purpose to be accomplished was an administrative purpose. These cases are in line with the previous cases ruled by the court upon the distinction between a matter being within the power of the commission to determine questions affecting it and the wisdom of a ruling made in pursuance of the power.

"The question thus ruled to be within the province of the commission to primarily determine is a different question from that raised by the allegation that a carrier has charged more than or otherwise departed from the published rate. This may involve the meaning of the tariff in order to determine the fact of the alleged departure. To hold that the court cannot determine the fact of whether the published rate or more or less than the published rate has been collected in a given case is to take from the courts the jurisdiction committed to them by Congress. Nor is this result changed by the fact of whether the rate be one which is fixed by an act of Congress, by a tariff or schedule of rates fixed by being filed by the carrier, or by a ruling by the commission. In any case, the fact of departure from it must be a fact within the province of the court to find, or it can never proceed to render judgment in any case."

See, also, *Louisville, etc., R. Co.* v. *Brewing Co.*, 172 Fed. 117 (96 C. C. A. 322, 40 L. R. A. [N. S.] 798); *St. Louis, etc., R. Co.* v. *Oil & Cotton Co.* (Tex. Civ. App.), 128 S. W. 1194; *Western, etc., R. Co.* v. *Provision Co.*, 142 Ga. 246 (82 S. E. 644).

We think the court had jurisdiction to determine

whether there had been an overcharge under the tariffs as fixed and published.

2. Did the court err in excluding the report of the interstate commerce commission?  It appears in that report that the wastes and overflows were mixed in the package for shipment with other goods which were clearly plumbers' supplies, and the whole shipment would be subject to the highest rated article in the box.

We discover no reversible error in the case.  Judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.