No. 28,421.

J. M. THOMAS, Doing Business as the THOMAS GRAIN COMPANY, *Appellee*, v. THE CHICAGO BURLINGTON & QUINCY RAILROAD COMPANY, *Appellant*.

(273 Pac. 451.)

Opinion filed January 12, 1929.

H. M. Langworthy, Byron Spencer, Frank H. Terrell and Robert G. Merrick, all of Kansas City, Mo., for the appellant; H. J. Nelson, of St. Joseph, Mo., of counsel.

Grant W. Harrington, of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a judgment of the district court of Wyandotte county awarding damages and attorney's fee to plaintiff because of an alleged overcharge of freight rates for transporting a carload of corn from Bartley, a shipping point on the Burlington railway in southwestern Nebraska, to Gower, a local point on the Santa Fe railway about ten miles southeast of St. Joseph, Mo.

The corn was originally billed for shipment from Bartley to St. Joseph, but was reconsigned to Gower. Plaintiff prepaid the freight charges from Bartley to St. Joseph according to the published tariffs, $20\frac{1}{2}$ cents per hundredweight, and was compelled to pay an additional 7 cents when the corn was reconsigned to Gower.

Defendant sought to justify this rate on the ground that the authorized tariff schedules do not specify any rate from Bartley to Gower, and that the railway company was therefore justified in adding the local rate of 7 cents per hundredweight from St. Joseph to Gower.

Plaintiff's claim is based on the fact that the proportional rate from St. Joseph, Mo., to Kansas City, Mo., is 4 cents per hundredweight, that Gower is an intermediate point between St. Joseph and Kansas City, and the published tariff schedules provide that where the more distant point takes a less rate the latter shall be considered as the correct proportional rate to the intermediate point. The rule prescribed by the tariff, and which is the nub of this lawsuit, is thus stated in Santa Fe No. 5588-M and I. C. C. No. 9317:

"Rates to or from points not shown in this tariff will, in the absence of specific rate from point of origin to destination, be made by adding to the rates shown in this tariff the rates shown in other tariffs lawfully on file with the

interstate commerce commission, but if the rate so made exceeds the rate to or from a point beyond on the same direct line or route, as shown in this tariff, the latter will apply."

On the issues thus joined the evidence showed that the Santa Fe railway has two rail lines from St. Joseph to Kansas City, one on the east and another on the west side of the Missouri river, but neither line goes directly to Kansas City. Gower, the destination of this corn shipment, is on the Santa Fe line which runs easterly from St. Joseph, through Gower, for a considerable distance to Henrietta on the Santa Fe main line and thence southwesterly to Kansas City, a total distance of 113 miles. The other line runs west from St. Joseph to Atchison, thence southerly through Kansas to Holliday, and thence easterly on the Santa Fe main line to Kansas City, a total distance of 92 miles.

The pertinent tariff schedules and rules were introduced in evidence, and witnesses of apparent experience and competence on the somewhat abstruse subject of freight rates explained their meaning. It was shown that where there is no through rate specified from one point to another (as from Bartley, Neb., to Gower, Mo.) the rate covering such shipment is the lowest combination via the route taken, but where that combination exceeds the rate to a more distant point on the same direct line or route as shown on the tariff the latter rate is the correct one. One item of an official tariff gave the rate from Bartley to St. Joseph as 20½ cents per hundredweight. Another item gave the rate from St. Joseph to Gower at 7 cents, and from St. Joseph to Kansas City "on shipments originating at points not covered by through rates at 4 cents per cwt." Appropriate references were repeatedly made in the tariff to the rule quoted above, which declared that where a rate had to be arrived at by computation and "the rate so made exceeds the rate to or from a point beyond on the same direct line or route, as shown in this tariff, the latter will apply."

An interpretation of this rule and particularly of the meaning of the phrase, "to a point beyond on the same direct line or route," brought a clash of expert opinion testimony, that of the defendant being that it meant the shortest route, which would be the 92-mile line via Atchison and west of the Missouri river to Holliday and thence east to Kansas City. On the other hand, the evidence for plaintiff was that the direct line or route meant one where there was

"no back haul." It was also developed in cross-examination of an expert witness for defendant that occasionally traffic like this corn shipment, originating on other lines and delivered to the Santa Fe at St. Joseph, did move over the longer east-side route through Gower to Kansas City, and that when it did the rate was 4 cents per hundredweight, just as it was over the shorter west-side line. Another fact of considerable evidential significance was shown by the circumstance that after this controversy arose the tariff rule was amended thus:

"Rates between St. Joe on the one hand and Kansas City on the other will apply when routed through Holliday, Kan., and the line north to Wilder only."

Defendant's requested findings of fact and declarations of law were refused. The trial court found generally and specially for plaintiff and gave judgment accordingly. Some of the court's special findings read:

"1. That the shipment of corn, in evidence, originated at Bartley, Neb., and moved from there to Saint Joseph, Mo., over the line of the Chicago, Burlington & Quincy Railroad Company.

"2. That the shipment was at that point reconsigned to Gower, Mo., and that said shipment moved from Saint Joseph, Mo., to Gower, Mo., over the line of the Atchison, Topeka & Santa Fe Railway Company.

"3. That the Atchison, Topeka & Santa Fe Railway Company has a line from Saint Joseph, Mo., to Kansas City, Mo., via Atchison and Leavenworth, Kan.

"4. That said line is the direct line between Saint Joseph, Mo., and Kansas City, Mo.

"5. That said Atchison, Topeka & Santa Fe Railway Company has another line between Saint Joseph, Mo., and Kansas City, Mo., via Gower and Henrietta, Mo., which said line is also the direct line between Saint Joseph, Mo., and Kansas City, Mo."

Defendant appeals, urging various points which will be noted in the order of their presentation.

Although the judgment for plaintiff was only for $30.20, and an attorney's fee of $50, an appeal will lie to this court seeing that the cause and its proper determination necessarily depended upon matters of federal law, and our appellate jurisdiction extends to all cases involving "the constitution, laws or treaties of the United States," regardless of the amount in controversy. (R. S. 60-3303; 3 C. J. 389; 2 R. C. L. 35.) This point has been incidentally noted in *Mo. Pac. Rly. Co. v. Kimball*, 48 Kan. 384, 29 Pac. 604; *Coghlan v. Williams*, 69 Kan. 144, 76 Pac. 394; *Griggs v. Hanson*, 86 Kan.

632, 634, 121 Pac. 1094; *Harrington v. Missouri Pac. Rld. Co.*, 123 Kan. 35, 254 Pac. 379.

Error is assigned on the trial court's finding of fact that the Santa Fe line from St. Joseph to Kansas City via Gower and Henrietta on the east side of the Missouri river was a direct line. But it cannot be denied that there was substantial testimony to support that finding, and it was only in the single matter of actual mileage that it was any less a direct route than the one through Atchison and Holliday on the west side of the Missouri river. An examination of any good railroad map makes it none too easy to declare that the west route with its two crossings of the Missouri river is less devious and more direct than the east route, except in the one matter of shorter mileage. The rulings of the interstate commerce commission on this subject are entitled to great consideration, not as evidence, but as illustrative of its methods of interpreting tariff schedules. The commission lives in an atmosphere where tariff interpretations are debated the year round, and its opinions are bound to be helpful even where they are not authoritative and controlling. By repeated rulings that tribunal has held that mere differences on mileage are not controlling. Thus in *Kyoleum Co. v. Director General*, 104 I. C. C. 1, it was said:

"The tariff naming the rate of 26.5 cents from East St. Louis to Pittsburgh contained no restriction as to routing, and all lines over which these shipments moved were parties to the tariff. . . . The distance from St. Louis to Pittsburgh via the Pennsylvania is 612 miles, and the distance from St. Louis via the route of movement through Chicago . . . was 1,118 miles, a difference of 506 miles. . . . *No back haul was involved* in the instant case. The route of movement was very circuitous, but no question of reasonableness is involved." (pp. 2, 3.)

In *Freeman Grain Co. v. Director General*, 68 I. C. C. 559, the complainant consigned nine cars east from Lucas, Kan., to Salina, and then reconsigned them to California points. Lucas is 56 miles northwest of Salina on a branch of the Union Pacific, and traffic from Lucas to western points would normally move west through Colby. The haul through Salina was 78 miles longer than that through Colby. The rate from Lucas to California points was 64 cents, and the commission held the shipper was entitled to that rate. It said:

"There was nothing in the tariff naming the joint rate which would have precluded complainant from routing the shipments through Salina had they been billed direct from Lucas to the California points." (p. 560.)

In *Ginocchio-Jones Fruit Co. v. Director General*, 81 I. C. C. 495, a carload of grapes had moved from Fresno, Cal., through Kansas City to Chicago, and then by reconsignment back to Kansas City. The rate from Fresno was the same to both Kansas City and Chicago. The carrier collected the rate to Chicago plus a return haul to Kansas City. The commission held:

"As the through rate from Fresno to Kansas City was not restricted to any particular routes, . . . it would have been applicable on a shipment moving over the Southern Pacific through El Paso, Tex., to New Orleans, thence Illinois Central to Chicago, and any carrier party to the tariff beyond. Since there was a published through rate from point of origin through point of diversion to final destination under the reconsignment tariff of the Santa Fe, the rate applicable from point of origin to final destination was applicable to complainant's shipment." (p. 496.)

It has also been repeatedly held by the commission that where a railroad company desires to restrict the application of its published rates to one of two or more available routes it must do so in clear and unequivocal language, otherwise the published rate will apply to either route. Thus, in *Pioneer Lumber Co. v. Director General*, 74 I. C. C. 288, it was said:

"Defendants argue that they [the rates] applied only by way of the direct route through Staples and Brainard, Minn., and not over the route of movement, which is 146 miles longer. There was nothing in the governing tariffs which restricted the application of the rates to a particular line of the Northern Pacific." (p. 289.)

In *Routing on Grain and Grain Products*, 81 I. C. C. 725, where the construction of tariff schedules of rates from Illinois points to Texas points was involved, and the railroads contended that those rates did not apply through certain intermediate points in Iowa, it was said:

"If it were respondent's purpose to restrict the application of the section 2 rates to particular routes, they should have done so by clear and unequivocal language. The tariff contains no definition of direct routes. On the contrary, the routes are open and shipments may move to Texas points from Chicago and Peoria, both served by the Illinois Central and Northwestern, through Omaha, *and unlisted points in Iowa on these routes would be directly intermediate.*" (p. 727.)

In *Rose Lake Lumber Co. v. O. S. L. R. R. Co.*, 100 I. C. C. 221, the commission said:

"On numerous occasions we have found that if carriers desire to restrict the application of a joint rate to any particular route they should do so by clear and unequivocal language. With no routing restrictions shown in the tariff

naming the joint rate sought, the shipment is properly entitled to such rate." (p. 222.)

In addition to the testimony for plaintiff, the trial court could justly attach considerable evidential significance to the fact that the present controversy seems to have prompted the carriers to amend their tariff and thus limit the 4-cent rate from St. Joseph to Kansas City to the route west of the Missouri river. Since there was substantial and competent evidence to support the trial court's findings of fact, it will have to stand. (*Farney v. Hauser*, 109 Kan. 75, 198 Pac. 178; *Citizens State Bank v. Wiseman*, 125 Kan. 510, 514, 265 Pac. 39; *Phoenix Ry. Co. v. Landis*, 231 U. S. 578, 59 L. Ed. 377, 381.)

It is next contended that the trial court erred in allowing plaintiff an attorney's fee. It would not be allowable under the Kansas statute, as we have repeatedly held. (*Andrews v. Railroad Co.*, 99 Kan. 347, 161 Pac. 600; *Grain Co. v. Railway Co.*, 105 Kan. 272, 276, 162 Pac. 405; *Harrington v. Missouri Pac. Rld. Co.*, 123 Kan. 35, 254 Pac. 379.) But in this case the fee was awarded under express authority of the federal statute itself. Section 8 of the act (U. S. Comp. Stat. 1918, § 8572) provides:

"In case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

It is contended, however, that the state court had no jurisdiction of this action involving this breach of the interstate commerce act, and that his grievance could only be redressed in a federal court; and that this is the necessary effect on the literal text of section 9, which reads:

"Any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district [or circuit] court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case

elect which one of the two methods of procedure herein provided for he or they will adopt. In any such action brought for the recovery of damages the court before which the same shall be pending may compel any director, officer, receiver, trustee or agent of the corporation or company defendant in such suit to attend, appear, and testify in such case, and may compel the production of the books and papers of such corporation or company party to any such suit; the claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying, but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding." (U. S. Comp. Stat. § 8573.)

It is indeed a surprising contention that such a grievance as that of plaintiff is not justiciable in a state court—and yet there appear to be some federal and state decisions to support that view. However, the United States supreme court is the paramount authority on the construction of federal statutes, and nothing that court has yet said gives any intimation that such a claim as plaintiff's cannot be litigated in a state court of general jurisdiction. And unless the federal statute expressly so declared or the federal supreme court so affirmed, we could not be persuaded that in the enactment of remedial legislation of such widespread general interest as the regulation of interstate commerce, the congress has stripped the state courts of that jurisdiction they have always exercised—that of vindicating the rights of litigants under federal law precisely as they do under state law and to the same extent. Do not the state courts year in and year out hear and determine controversies arising under the federal employer's liability law, the federal safety appliance act, and the like? Do we not entertain and decide actions filed by the railway carriers for the recovery of undercharges? (*Case v. Union Pac. Rld. Co.*, 119 Kan. 706, syl. ¶ 2, 241 Pac. 693.) How comes it we have jurisdiction of cases under the interstate commerce act when a railway carrier seeks to recover an undercharge, but no jurisdiction when a shipper seeks to recover an overcharge or damages for its exaction? It is a general rule that where no inconsistency with the supremacy of the national government or its official agencies is concerned the state courts have concurrent jurisdiction with federal courts of actions arising under federal statutes, just as federal courts, subject to limitations imposed by the federal law itself, have concurrent jurisdiction with state courts of actions arising under state law.

In the notable early case of *Gittings v. Crawford*, Taney's C. C. Dec. 1 (Fed. Cas. 5465), the defendant in a suit on a promissory

note was a British consul. He challenged the jurisdiction of an inferior federal court on the ground that under the federal constitution (art. 3, § 2) the United States supreme court had sole jurisdiction of cases "affecting ambassadors, other public ministers and consuls." Chief Justice Taney met and disposed of this contention in an opinion from which the following instructive excerpt is gleaned:

"There are no express words of exclusion in the clause which confers original jurisdiction in the cases mentioned upon the supreme court. Why should they be implied? They are clearly not implied in relation to the state courts, in the clause immediately preceding, which gives judicial power in certain cases to the courts of the United States; . . .

" . . . The true rule in this case is, I think, the rule which is constantly applied to ordinary acts of legislation, in which the grant of jurisdiction over a certain subject-matter to one court, does not, of itself, imply that that jurisdiction is to be exclusive." (pp. 7, 9.)

See, also, *Robb v. Connolly,* 111 U. S. 624, 637, 28 L. Ed. 542, 546.

In *Hardaway v. Southern Railway,* 90 S. C. 475, where a similar contention was made as a defense to an action to recover an overcharge, it was said:

"Numerous cases hold, we think correctly, that the federal courts and the interstate commerce commission have exclusive jurisdiction of actions based upon the interstate commerce act, or brought to enforce a right created by that act. (*Van Patton v. Chicago, etc., R. Co.,* 74 Fed. 981; *Edmunds v. Illinois Central R. Co.,* 80 Fed. 78; *Carlisle v. Missouri, etc., R. Co.,* 168 Mo. 652, 68 S. W. 898; *Copp v. L. & N. R. Co.,* 43 La. Ann. 511, 9 So. 441, 12 L. R. A. 725.) In some of the cases the broad statement is made that the state courts have no jurisdiction of actions to recover overcharges in the rates on interstate shipments, but an examination of these cases discloses the fact that the cause of action was created by or the action was based upon the interstate commerce act, or the word 'overcharge' was used in the sense of an unreasonable charge. . . .

"To hold that the state courts have no jurisdiction of actions like this will result in so much inconvenience and be so injurious in its consequences to the citizens of the states, and will place them so completely at the mercy of interstate carriers with regard to the settlement of such claims, that the argument in favor of that conclusion should be more cogent and convincing than it is to induce its adoption. The practical result of requiring shippers to go before the interstate commerce commission or in the federal courts to collect these small claims will be to compel the abandonment of them altogether. We feel sure that congress did not contemplate or intend any such result, and in the absence of such intent, plainly expressed in or necessarily to be inferred from the provisions of the act, we are not inclined to adopt a construction which will lead to that result." (pp. 483, 486.)

In *Galveston, H. & S. A. Ry. Co. v. Wallace,* 223 U. S. 481, 56 L. Ed. 516, which was an action against a railway carrier for damages for failure to deliver goods shipped in interstate commerce, the jurisdiction of the state court where the action was begun was challenged on the ground that section 9 of the interstate commerce act made the jurisdiction of the federal courts exclusive. The United States supreme court said:

"Where the statute creating the right provides an exclusive remedy, to be enforced in a particular way, or before a special tribunal, the aggrieved party will be left to the remedy given by the statute which created the right. But jurisdiction is not defeated by implication. And, considering the relation between the federal and state government, there is no presumption that congress intended to prevent state courts from exercising the general jurisdiction already possessed by them, and under which they had the power to hear and determine causes of action created by federal statute. (*Robb v. Connolly,* 111 U. S. 624, 637, 28 L. Ed. 546, 4 Sup. Ct. Rep. 544.)

"On the contrary, the absence of such provision would be construed as recognizing that where the cause of action was not penal, but civil and transitory, it was to be subject to the principles governing that class of cases, and might be asserted in a state court as well as in those of the United States. This presumption would be strengthened as to a statute like this, passed not only for the purpose of giving a right, but of affording a convenient remedy." (p. 490.)

In *Penna. R. R. Co. v. Puritan Coal Co.,* 237 U. S. 121, 59 L. Ed. 867, a shipper brought an action in a Pennsylvania state court against a railway company for damages for its failure and prejudicial discrimination in the matter of furnishing cars for the transportation of coal. The defendant's motion to dismiss for want of jurisdiction was denied, and error was assigned thereon—

"(1) In holding that the state court had jurisdiction.

"(2) In failing to hold that, under the commerce act [24 U. S. Stat. 379, ch. 104, Com. Stat. 1916, § 8563], the federal court alone had jurisdiction." (p. 125.)

The case went to the federal supreme court on a writ of error where the contention was made that whatever remedies were open to plaintiff were those conferred by the interstate commerce acts, and that those remedies did not embrace actions in state courts to recover damages because of injuries resulting from discrimination in the furnishing of cars. After briefly stating the antecedent history of the case, the court said:

"The railway company [insists] . . . that, (1) the determination of the proper basis for the distribution of cars was a matter calling for the exercise of the power of the interstate commerce commission; (2) that no court had jurisdiction of a suit against it for discriminatory allotment until

after the commission had determined that its rule for distribution was improper; and (3) that no suit for damages against an interstate carrier could be brought for damages occasioned by a failure to deliver cars, or for an unjust discrimination in distribution except in a United States court.

"1. These contentions involve a consideration of the jurisdiction of the commission, of the state courts, and of the federal courts. But fortunately it will not be necessary to enter into an elaborate discussion of each of the questions." (p. 127.)

The court then summarized sections 3, 8 and 9 of the interstate commerce act, noted the new rights conferred upon shippers thereunder, and in what respect those rights can only be redressed by the interstate commerce commission or exclusively in the federal courts, and continued thus:

"But §§ 8 and 9, standing alone, might have been construed to give the federal courts exclusive jurisdiction of all suits for damages occasioned by the carrier violating any of the old duties which were preserved and the new obligations which were imposed by the commerce act. And, evidently, for the purpose of preventing such a result, the proviso to § 22 declared that 'nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies.'

"That proviso was added at the end of the statute, not to nullify other parts of the act, or to defeat rights or remedies given by preceding sections, but to preserve all existing rights which were not inconsistent with those created by the statute. It was also intended to preserve existing remedies, such as those by which a shipper could, in a state court, recover for damages to property while in the hands of the interstate carrier; damages caused by delay in shipment; damages caused by failure to comply with its common-law duties, and the like. But for this proviso to § 22 it might have been claimed that, congress having entered the field, the whole subject of liability of carrier to shippers in interstate commerce had been withdrawn from the jurisdiction of the state courts, and this clause was added to indicate that the commerce act, in giving rights of action in federal courts, was not intended to deprive the state courts of their general and concurrent jurisdiction. (*Galveston, &c., R. R. v. Wallace,* 223 U. S. 481, 56 L. Ed. 516, 32 Sup. Ct. Rep. 205.)

"Construing, therefore, §§ 8, 9 and 22 in connection with the statute as a whole, it appears that the act was both declaratory and creative. It gave shippers new rights, while at the same time preserving existing causes of action. It did not supersede the jurisdiction of state courts in any case, new or old, where the decision did not involve the determination of matters calling for the exercise of the administrative power and discretion of the commission, or relate to a subject as to which the jurisdiction of the federal courts had otherwise been made exclusive." (p. 129.)

Defendant holds the view that if any redress could be afforded plaintiff other than in the federal court it was the alternative one of

a proceeding before the interstate commission. It seems to us quite clear that the interstate commerce commission could do nothing for plaintiff. It had done its full duty when it approved the tariff rates and rules under which this carload of corn moved, and plaintiff has no complaint with those rates or rules. He does not say that the 20½-cent rate from Bartley to St. Joseph and the 4-cent rate for points intermediate between St. Joseph and Kansas City are unreasonable. He is quite satisfied with those authorized and published rates. So all discussion of this controversy, being the concern of the interstate commerce commission, is beside the mark.

Looking into the cases relied on by defendant to support its contention that the jurisdiction of the federal courts for damages for overcharges is exclusive, we note the case of *Van Patten v. Chicago, M. & St. P. R. Co.*, 74 Fed. 981, where it was so held. Sections 8 and 9 of the act were discussed, but the significance of section 22, so clearly noted by the United States supreme court in *Penna. R. R. Co. v. Puritan Coal Co.*, supra, was overlooked. Moreover, in the Van Patten case, nobody was contending that the state court had jurisdiction. The question was whether the federal circuit court of Iowa or some court (whether state or federal not raised) in Wisconsin, the domicile of the defendant corporation, had jurisdiction. In another case cited by defendant, *Northern Pac. Ry. Co. v. Pacific Coast Lumber Mfrs. Ass'n*, 165 Fed. 1, a number of lumber companies sought to enjoin a number of railroads from advancing their interstate freight rates in violation of the federal antitrust act and the interstate commerce act. What is said in the opinion is interesting and instructive *arguendo*, but again the matter of jurisdiction by a state court was not involved.

In *R. J. Darnell, Inc., v. Illinois Cent. R. Co.*, 190 Fed. 656, cited by defendant, the action was begun in a state court and removed to a federal court. One of complainant's grievances was that the published freight rate on lumber from Memphis to New Orleans was excessive, and another was that the interstate commerce commission had ordered the carrier to desist from charging the published rate and to reduce it. No reparation allowance had been made by the interstate commerce commission, and the carrier's demurrer to complainant's declaration was therefore quite properly sustained; and what was said as to the want of jurisdiction in the state court was not necessary to a conclusive disposition of the

controversy. Another case cited by defendant, *Carlisle v. Missouri Pacific Ry. Co.*, 168 Mo. 652, seems to support defendant's contention, but it was decided in 1902, since which time the federal supreme court has repeatedly held that there is no warrant for holding that the jurisdiction of the federal court is exclusive of all controversies arising under sections 8 and 9 of the act.

In *Pennsylvania R. R. v. Sonman Coal Co.*, 242 U. S. 120, 61 L. Ed. 188, 190, which was an action begun in a state court for damages because of the defendant carrier's failure to furnish cars in violation of the interstate commerce act, and where it was insisted that by sections 8 and 9 the state court had no jurisdiction, the supreme court said:

"It is true that §§ 8 and 9 deal with the redress of injuries resulting from violations of the act, and give the person injured a right either to make complaint to the interstate commerce commission or to bring an action for damages in a federal court, but not to do both. If the act said nothing more on the subject, it well may be that no action for damages resulting from a violation of the act could be entertained by a state court. But the act shows that §§ 8 and 9 did not completely express the will of congress as respects the injuries for which redresses may be had or the modes in which it may be obtained, for § 22 contains this important provision: 'Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies.' The three sections, if broadly construed, are not altogether harmonious, and yet it evidently is intended that all shall be operative. Only by reading them together and in connection with the act as a whole can the real purpose of each be seen. They often have been considered, and what they mean has become pretty well settled. Thus we have held that a manifest purpose of the provision in § 22 is to make it plain that such 'appropriate common law and statutory remedies' as can be enforced consistently with the scheme and purpose of the act are not abrogated or displaced (*Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426, 446, 447, 51 L. Ed. 553, 561, 562, 27 Sup. Ct. Rep. 350, 9 Ann. Cas. 1075); that this provision is not intended to nullify other parts of the act, or to defeat rights or remedies given by earlier sections, but to preserve all existing rights not inconsistent with those which the act created (*Pennsylvania R. R. Co. v. Puritan Coal Co.*, 237 U. S. 121, 129, 59 L. Ed. 857, 872, 35 Sup. Ct. Rep. 484); that the act does not supersede the jurisdiction of state courts in any case, new or old, where the decision does not involve the determination of matters calling for the exercise of the administrative power and discretion of the interstate commerce commission, or relate to a subject as to which the jurisdiction of the federal courts is otherwise made exclusive (Id. 130); that claims for damages arising out of the application, in interstate commerce, of rules for distributing cars in times of shortage, call for the exercise of the administrative authority of the commission where the rule is assailed as unjustly discriminatory, but where the assault is not against the

rule, but against its unequal and discriminatory application, no administrative question is presented and the claim may be prosecuted in either a federal or a state court without any precedent action by the commission (Id. 131, 132); and that, if no administrative question be involved, as well may be the case, a claim for damages for failing upon reasonable request to furnish to a shipper in interstate commerce a sufficient number of cars to satisfy his needs may be enforced in either a federal or a state court without any preliminary finding by the commission, and this whether the carrier's default was a violation of its common-law duty existing prior to the Hepburn act of 1906, or of the duty prescribed by that act (Id. 132-135; *Eastern Ry. Co. v. Littlefield*, 237 U. S. 140, 143, 59 L. Ed. 878, 882, 35 Sup. Ct. Rep. 489; *Illinois Central R. R. Co. v. Mulberry Hill Coal Co.*, 238 U. S. 275, 283, 59 L. Ed. 1306, 1310, 35 Sup. Ct. Rep. 760; *Pennsylvania R. Co. v. Clark Coal Co.*, 238 U. S. 456, 472, 59 L. Ed. 1406, 1413, 35 Sup. Ct. Rep. 896).

"Applying these rulings to the case in hand, we are of opinion that a state court could entertain the action consistently with the interstate commerce act.. Not only does the provision in § 22 make strongly for this conclusion, but a survey of the scheme of the act and of what it is intended to accomplish discloses no real support for the opposing view." (p. 123.)

Another recent case to the same effect is *St. Louis, B. & M. Ry. v. Taylor*, 266 U. S. 200, 69 L. Ed. 247, 42 A. L. R. 1232.

To summarize and conclude: Where the reasonableness of the rate is not assailed and no question affecting the power or administrative policy of the interstate commerce commission is involved, and the controversy merely involves a question whether the carrier has exacted a rate in excess of that prescribed in its own published schedules, the state court has jurisdiction. To this effect are: *W. L. Shepard Lumber Co. v. Atlantic Coast Line R. Co.*, 112 So. 323; *G. W. Oil Co. v. C., M. & St. P. Ry. Co.*, 275 Ill. 56; *Illinois Cent. R. Co. v. Henderson Elevator Co.*, [Ky. Ct. App.] 127 S. W. 779; *Brass Works v. Southern Pacific Co.*, 187 Mich. 393; *Reliance Elevator Co. v. Chicago, M. & St. P. Ry. Co.*, 139 Minn. 69; *Wilson v. Long Island R. Co.*, 165 N. Y. Supp. 913; *Hardaway v. Southern Railway*, 90 S. C. 475; *Payne v. White House Lumber Co.*, [Tex. Civ. App.] 231 S. W. 417; *Lilly Co. v. Northern Pac. R. Co.*, 64 Wash. 589.

The record contains no error, and the judgment is affirmed.