HARDY, Judge.
This is a suit in which plaintiff seeks judgment against defendant in the principal sum of $1,223.93, representing the balance due on premiums on insurance policies issued by plaintiff. After an amendment of plaintiff’s petition, pursuant to the filing of an exception, defendant answered, denying the allegations of plaintiff’s petition. In the course of trial defendant tendered in open court the sum of $710, representing the sum of $661.71, which it admitted to be due, together with accrued court costs and interest, which tender was refused.
After trial there was judgment in favor of plaintiff for the amount prayed, from which defendant has appealed.
Quad Drilling Corporation was organized in or about the year 1946, the officers being four brothers, Malcolm H. Sneed, President; S. T. Sneed, Vice-President; W. J. Sneed, Secretary; and Hugh Sneed, Treasurer. The corporation is actively engaged in the principal business of oil and gas well drilling operations, and, in the usual course of its business, carries customary insurance protection, particularly automobile and workman’s compensation liability. Plaintiff has handled the insurance account of the corporation since its organization until some time during the year 1953, when he found it necessary to cancel defendant’s insurance policies. Upon the basis of a final audit made in September, 1953, a corrected audit made in June, 1954, and a reformation of defendant’s account upon the basis of charges and credits ascertained by these audits, plaintiff claims the balance set forth in the sum of $1,223.93, representing unpaid premiums for insurance protection, which premiums he alleges he has paid to the insuring companies which he represents as an agent.
Defendant disputes the correctness of plaintiff’s account, first, on the ground of an alleged overcharge to the extent of $588 in premiums claimed on a workman’s compensation insurance policy issued by Traders & General Insurance Company covering the officers of the corporation, and, second, defendant denies liability to the extent of $279.35 charged as premium for an insurance binder issued by Lloyd’s' of London for excess insurance, which binder, according to defendant’s contention, was not issued until a date subsequent to cancellation of the insurance.
Plaintiff urges that defendant is without right to seek judicial relief inasmuch as it has failed to exhaust administrative remedies before the Louisiana Insurance Commission. This position was sustained by our learned brother of the district court in his written opinion on the ground expressed as follows:
“It is a-fundamental rule of law that an administrative remedy provided by the Legislature must be exhausted before relief can be sought in the courts.”
Cited in support of this holding was. the case of O’Meara v. Union Oil Co. of California, 212 La. 745, 33 So.2d 506, 507, 509, from the opinion in which the district judge cited, with approval, the following language of the Supreme Court:
*624 ,“We also called attention to the fact that administrative officers with fact finding powers relieved the Legislature and the judiciary from a great deal of detail work and imposed these duties on an officer as agent of the State for determination because of his peculiar knowledge of such matters. We pointed out also that courts will not place their judgment above such administrative officers because of this fact. On account of the development and growing progress of our country, it would be practically, if not impossible, for the Legislature and courts to expeditiously dispose of these matters, if it were not for the fact that these administrative officers relieve the Legislature of all this detail work and the courts from being congested with many matters that can be thrashed out by those familiar with them.”
Wé concede the soundness of the well recognized doctrine that administrative remedies must be exhausted before relief can be sought from the courts; O’Meara v. Union Oil Co. of California, supra; Shreveport Laundries, Inc., v. Southern Cities Distributing Co., 176 La. 994, 147 So. 56; Porter v. O’Neal, 205 La. 445, 17 So.2d 622; State ex rel. Johnson v. Higgins, La.App., 47 So.2d 56; Richardson v. Parish Council of Parish of East Baton Rouge, La.App., 53 So.2d 458; Marino v. City of Baton Rouge, La.App., 61 So.2d 586.
However, in the instant case we are called upon to determine, not the validity of the general principle above expressed, but the question as to whether statutory provisions require the determination of the factual issue here involved by an administrative body as a condition precedent to judicial review.
Zealous counsel for plaintiff urges the applicability of the statutory provisions set forth in that part of the Insurance Code designated as LSA-R.S. 22:1351-22:1365 under the heading “Administrative Orders, Hearings' and Appeals”.
Reference to the sections noted discloses that they provide for the procedure and conduct of hearings “for any purpose within the scope of this code” as the Secretary of State may deem necessary.
Unquestionably, these statutory provisions would apply in and to any questions involving the rules and regulations of the Louisiana Insurance Commission regarding the establishment of rates and classifications under policies of workman’s compensation insurance. But that is not the question which is presented in the instant case. Defendant does not take issue with the premium rates and the classification of operations which have been fixed, by the Commission. The defendant does object, and consequently contests, the correctness of the action of the insurance company in placing one of defendant’s officers in the classification of driller instead of what defendant insists is the proper classification of a public relations official. The materiality of this issue is demonstrated by the fact that the premium rate for the classification of driller is fixed at approximately $7 per hundred dollars salary compensation, while the premium rate for a public relations officer of the corporation is fixed at eight cents per hundred dollars salary compensation, which difference in rate in the instant case amounts to a total sum of $588.
This question does not involve, nor does it have bearing upon, the correctness or reasonableness of the rate fixing and classification rules and regulations of the Louisiana Insurance Commission, and, therefore, it does not concern the authority nor does it fall within the jurisdiction of the Commission as fixed, established and provided by the Insurance Code. On the contrary, the issue here presented concerns a simple dispute between the insurance company and its policy holder with respect to the resolution of a question of fact.
Under the circumstances we do not regard any of the above mentioned authorities as being appropriate to the instant case. The O’Meara case involved a matter over which the Conservation Commissioner had been vested with jurisdiction by legislative act, which act contained a provision requiring the exhaustion of administrative remedies before relief might be sought *625 from the courts. The Shreveport Laundries and the Porter cases involved matters under the jurisdiction of the Public Service Commission bearing upon the rate fixed and the regulatory authority of that body. The Johnson case presented a purely administrative question within the express jurisdiction of the Department of Public Welfare. The Richardson and Marino cases concerned the right to the issuance of beer and liquor permits, respectively, which authority had been delegated to the Board of Tax Appeals.
As we have attempted to point out in this opinion, the subject matter of this litigation does not involve nor concern any of the powers, duties nor authority conferred upon and delegated to the Louisiana Insurance Commission by the Legislature under the provisions- of the Insurance Code. The issue is limited to the determination of a factual question as between the insurer and the insured, and we have failed to find any authority which requires the submission of such a factual proposition to determination by an administrative authority not specifically vested with jurisdiction thereof. As was observed in Delta Life Ins. Co. v. Martin, La.App., 59 So.2d 465, 470:
“ * * * this Court knows of no law and none has been cited which authorizes our Insurance Commissioner to determine the individual rights between a policy holder and his insurer. This is a right reserved to the courts.”
With this pronouncement we are in complete and firm accord.
The distinction between an insurance commission’s rate making and classification power and the appropriate classification of a particular risk was well considered by the United States Court of Appeals, Fifth Circuit, in Rice v. Continental Casualty Co., 153 F.2d 964. The same distinction was carefully emphasized in the opinion of Judge Hamiter in Sibley L. B. & S. Ry. Co. v. Braswell Sand & Gravel Co., La.App., 199 So. 427, 429, certiorari denied, in the following language:
“It was held in the case of Pine Tree Lumber Company v. Chicago R. I. & P. Railroad Company, 123 La. 583, 49 So. 202, as the syllabus thereof shows, that: ‘Where an interstate carrier represents to a shipper that a certain freight .rate has been established between given points, and such rate has, in fact, been published, and the shipper sends his goods upon the faith of such representation and publication^ and is thereafter coerced into paying a higher rate, a state court has jurisdiction to hear and determine his suit for the recovery of the amount thus overpaid.’
“The court observes, in the opinion of such case, that there was no complaint that the alleged established rate was unreasonable, .or that the shipper contracted upon any other basis than that of the rate so established.
“It is said in the annotations on page 343 of 64 A.L.R., following the published report of the opinion in Thomas v. Chicago, Burlington & Quincy Railroad Company, 127 Kan. 326, 273 P. 451, 64 A.L.R. 322, that the generally accepted view is: Where the reasonableness of the rate is not assailed, and no question affecting the power or administrative policy of the Interstate Commerce Commission is involved, and the controversy merely involves the question whether the carrier has exacted a rate in excess of that prescribed in its own published schedules, the state court has jurisdiction.’
“In the instant case, defendant does not question the reasonableness of the Average Agreement Rule that has the approval of the Interstate Commerce Commission, and which the parties have contracted to follow in determining demurrage charges; hence, we are not asked to pass upon any legislative, administrative, or discretionary function of that approving body. It merely, complains that plaintiff has not complied with the provisions of that rule, but has computed the demurrage in some unauthorized and illegal manner. Under this complaint there is to be determined only the question of fact of *626 what is the correct demurrage charge according to the rule agreed on. This issue may be the subject of a state ■court’s consideration, as pointed out in the above-discussed authorities.”
We think the above reasoning adequately supports the distinction as to procedure, and we now turn to the consideration of the factual issue.
The background and history of the difference of opinion between insurer and insured may be briefly stated. W. J. Sneed, the Secretary of defendant corporation, was .arbitrarily classified by the insurer as a driller, whereas defendant contends that the said W. J. Sneed is the public relations officer of the corporation and has no active connection with, nor responsibility for, the conduct of the corporation’s well-drilling .activities.
It appears that the classification of drill<er, assigned by the insurer, was originally made by or upon the recommendation of one James E. Daniel, auditor for Traders & ■General Insurance Company. On trial, Daniel testified that he arrived at the classification on the basis of information received from a Mr. Collier, who was a bookkeeper for defendant at the time Daniel made his original audit in 1953. Specifically Daniel testified as follows:
“At the time of the original audit Mr. Collier insisted that all of the ■officers classified were at the lease site .and where the wells were drilling, and ■exposed to the drilling risks. I classified my audit accordingly.”.
In June, 1954, when Daniel made his re-audit of defendant’s account, he testified that Mr. Hugh Sneed, the Treasurer, advised that:
“Mr. W. J. Sneed, the Secretary, is a pilot and public relations man; and .according to Mr. Sneed, he’s supposed to more or less keep the * * * their partners in leases, and so on, happy and content.”
Continuing his testimony, Daniel declared "that he furnished this information to the home office of Traders & General Insurance Company, which again fixed the classification of W. J. Sneed as driller.
Controverting the basis for the classification, Mr. Hugh Sneed, Treasurer of the defendant corporation and brother of W. J. Sneed, testified on direct examination as follows:
“Q. Now from the beginning, what did each one of the brothers do, what were their duties with the Corporation? A. Well, in the beginning, it was a kind of a catch as catch can proposition, and I have been in the office approximately one hundred percent, but in days gone by, W. J. was in charge of drilling, or was considered probably the drilling Superintendent, but in recent years, he has been set up as public relations man, and does mostly the contacts in negotiating contracts or selling interests or what have you.
“Q. W. J. is the one that you said was the Secretary? A. Yes, sir.
“Q. When did he become the public relations and contact man ? A. It has been four or five years ago.
“Q. Would it have been before 1952? A. Yes, sir.
“Q. What did Malcolm Sneed, the President, do? A. Pie is actively in charge of drilling operations as the representative of the Company. He has a drilling superintendent, and he also has drillers on the job.
“Q. How about S. T. Sneed, Vice President? A. He has been for a number of years strictly in the obtaining of leases, curing of titles, and we refer to him as a land man.
“Q. Let’s say starting in 1951, to the present date, what have been the duties of the four officers, you and your three brothers? A. Well, Malcolm has been in charge of drilling operations as a tie between the office and the field, and S. T. has been in his capacity as land man, and Billy has been public *627 relations man, and I have been in the office. , .
“Q. Now from 1951 until the present date, has there been any change in the duties of the officers? A. No, I wouldn’t think so.
“Q. In other words, they are doing the same things now that they did hack in 1951, 1952 and 1953 and so forth? A. I would say ‘yes’.”
On cross-examination the same witness testified:
“Q. Mr. W. J. Sneed you testified is public relations and contact man. In that job, what are his principal duties in that job? A. Well, his principal job is to sell and to solicit business and to keep the people who are interested with Sneed Brothers in connection with the drilling of wells informed and keep them happy and satisfied.
“Q. Does he perform any work in connection with drilling of wells? Does he perform any actual work that would be performed by employees himself? A. He is not supposed to. As I said about Malcolm, he is not going to do any more in that — he is not supposed to do any. Now, according to my knowledge, he doesn’t.
“Q. I show you a document marked P-41 for identification, which appears to be a surgeon’s report covering an injury to W. J. Sneed on October 26, 1952, and ask if you are familiar with that injury and the background of it? A. Yes, sir. According to this he was hurt a lot worse than I think he was. I don’t understand all of these phrases they got in here (indicating).
“Q. What do you know about the injury to W. J. Sneed at that time ? A. Well, he was attempting to assist in starting a motor on a pumping well.
“Q. Would that be in connection with drilling operations or would that be in connection with lease operation after completion? A. That would be in connection with lease operations, but he had no business doing either one. In other words, I suppose if you saw a man with a flat tire on the side of the road and you knew him you could help him with fixing the flat. In this case here it was his own Company man on the job there, and maybe by himself, and he was trying to be of some assistance and got his hand under a belt on the pumping well, and apparently he fractured a finger or cut him up pretty bad.”
******
“Q. If W. J. Sneed is on the well, have you been on these different lease sites and seen him there ? A. No, sir.
“Q. What is his principal work, as far as you know? A. Well, in most instances, it would be to someone who is interested in this particular operation would be the final outcome of the well, and he would be there as being the contact between Sneed Brothers or Quad Drilling Corporation and those parties, and he would in all probability if the Schlumberger was run he would be present at the picking of points of the side wall samples or in making the final decision as to whether we would proceed with, drilling or abandon the well, or something we might want to test or something in that connection. He may be called upon at some time and he would probably visit the well and there would be certain things needed and if he was going direct to a telephone or to town and he might order something to go out there to that well, or to the rig or to the lease. But he is not supposed to take part in any drilling operations or in any lease operations as far as the actual coming in contact with the equipment.
“Q. Did you have occasion to question his being rated as a driller; Mr. W.J. Sneed? A. Yes, sir.”
The testimony of Daniel and Hugh Sneed constitutes the only evidep.ce in the record with reference to the issue of the *628 proper classification of Mr. W.- J. Sneed. Daniel, himself, admitted that he is totally unfamiliar with the drilling business, and it is apparent that ’his original classification of W. J. Sneed as a driller was made solely upon the basis of casual information, procured at thé timé he was in defendant’s office, to the effect that all of the Sneed brothers were out at the site of drilling operations on a lease in which they were interested. We think this ground was totally inadequate to support the classification made. Nor do we think plaintiff has succeeded in' showing any additional or stronger reason for the continuance of the classification after Daniel’s re-audit. On the other hand, Hugh Sneed’s testimony is uncontradicted, and we think he has made it perfectly clear that W. J. Sneed has no practical connection with nor responsibility for the company’s drilling operations. In short, it appears to us that plaintiff’s principal, the Traders & General Insurance Company, was grossly in error in classifying W. J. Sneed as a driller on what seems to us to be no more certain ground than a quite normal and natural interest on the part of said W. J. Sneed in the operations of the corporation in which he was personally interested.
A very similar factual situation was considered by our brethren of the First Circuit in New Amsterdam Casualty Co. v. Whitehead Motor Co., Inc., La.App., 170 So. 565, in which the court held that an isolated instance of the performance of hazardous work did not’ justify a high rate classification of a corporation executive.
Under this resolution of the factual issue presented it follows that defendant is entitled to the credit of $588, for which it contends on the basis of the lower premium rate classification which should have controlled the coverage on W. J. Sneed.
The application of this credit as a deduction from the account claimed by plaintiff in the sum of $1,223.93 would serve to reduce the amount due by defendant below the sum which it tendered in open court. However, the effect of defendant’s tender serves to fix, by its own admission, a liability to the extent' thereof, and it follows that plaintiff is entitled to the full amount of the tender.
The above calculation serves to eliminate the necessity for the consideration of defendant’s second contention for the allowance of an additional credit in the sum of $279.35.
For the reasons assigned the judgment appealed from is amended by reducing the amount thereof to the principal sum of $710, which amount at the time of the tender was sufficient to cover all costs accrued thereto. It follows that all other costs of both courts subsequently incurred should be, and accordingly they are, taxed against plaintiff-appellee. . As amended the judgment appealed from is affirmed.