# PENNSYLVANIA RAILROAD COMPANY *v.* SONMAN SHAFT COAL COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

No. 10.   Argued May 14, 1915; restored to docket for reargument June 14, 1915; reargued October 25, 1915.—Decided December 4, 1916.

The duty of a carrier to furnish cars for coal to be loaded at the mine and forwarded promptly for delivery to purchasers in other States is a duty in interstate commerce, notwithstanding the sale of the coal is f. o. b. at the mine.

If no administrative question is involved, a claim for damages for failure, upon reasonable request, to furnish to a shipper in interstate commerce cars sufficient to meet his needs may be enforced in a state as well as a federal court, and without preliminary finding by the Interstate Commerce Commission.

Such remedy is preserved by § 22 of the Interstate Commerce Act. The modes of redress provided by §§ 8 and 9 are not exclusive. *Pennsylvania R. R. Co.* v. *Puritan Coal Co.*, 237 U. S. 121.

Where relevant conditions of trade and transportation are normal, it is the duty of the carrier, upon reasonable demand, to furnish a shipper in interstate commerce sufficient cars to satisfy the actual needs of his business. That duty, in this case, existed under the common law until the date of the Hepburn Act, and continued thereafter under a provision of that act which, so far as concerns this case, amounts to an adoption of the common law. Act of June 29, 1906, § 1, c. 3591, 34 Stat. 584.

It is only in times of car shortage resulting from unusual demands or other abnormal conditions, not reasonably to have been foreseen, that car distribution rules originating with the carrier can be regarded as qualifying or affecting the right of a shipper to demand and receive cars commensurate in number with his needs. *Pennsylvania R. R. Co.* v. *Puritan Coal Co., supra.*

Evidence that throughout the period covered by alleged failures to supply cars, many cars of the carrier which otherwise would have been available to shippers on the carrier's lines were on the lines of other railroad companies as the result of through routings and joint rates, has no tendency to prove that the carrier supplied the complaining shipper with the cars to which he was entitled or to mitigate its default in that regard.

241 Pa. St. 487, affirmed.

THE case is stated in the opinion.

*Mr. Francis I. Gowen* and *Mr. John G. Johnson,* with whom *Mr. F. D. McKenney* was on the briefs, for plaintiff in error.

*Mr. A. M. Liveright* and *Mr. A. L. Cole* for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

The coal company brought this action to recover damages from the railroad company upon two grounds, first, that for a period of four years, beginning April 1, 1903, the railroad company had failed to supply the coal company with a sufficient number of cars to meet the needs of the latter's coal mine; and, second, that during the same period the railroad company, in furnishing cars to the several mines in that district, had discriminated unjustly against the coal company and in favor of some of its competitors. The second ground was eliminated by the coal company at the trial and does not require further notice. The action was begun in a state court and resulted in a

judgment for the coal company for $145,830.25, which the Supreme Court of the State affirmed. 241 Pa. St. 487.

The questions presented by the several assignments of error are: (1) What was the nature of the commerce involved? (2) If the commerce was interstate, was the action cognizable in a state court? (3) Was prejudicial error committed in excluding evidence presently to be mentioned?

The coal company sold its coal f. o. b. cars at the mine, and when the cars were loaded the coal was promptly forwarded to the purchasers at points within and without the State—largely to points in other States. This was well understood by both companies—by the coal company when it asked for cars and by the railroad company when it supplied them. Cars were not requested or furnished merely to be used in holding or storing coal, but always to be employed in its immediate transportation. While furnishing some cars for this service, the railroad company failed to furnish as many as the coal company needed and requested. It is plain that supplying the requisite cars was an essential step in the intended movement of the coal and a part of the commerce—whether interstate or intrastate—to which that movement belonged. It was expressly so held in *Pennsylvania R. R. Co.* v. *Clark Coal Co.*, 238 U. S. 456, 465–468. We there said of the sale and delivery of coal f. o. b. at the mine for transportation to purchasers in other States: "The movement thus initiated is an interstate movement and the facilities required are facilities of interstate commerce." Here the state court ruled that, as the coal was sold f. o. b. at the mine, the commerce involved was intrastate, even though the coal was going to purchasers outside the State. This was error, but it plainly was without prejudice unless it led the state court to exercise a jurisdiction which it did not possess.

In the courts below the railroad company contended that, in so far as the commerce involved was interstate,

the action could not be entertained by a state court consistently with the Interstate Commerce Act, c. 104, 24 Stat. 379; and that contention is renewed here. It proceeds upon the theory, first, that the coal company was without any right to redress in respect of its interstate business unless the failure to supply it with the requisite cars was a violation of some provision of that act; second, that §§ 8 and 9 of the act prescribe the only modes of obtaining redress for violations of its provisions, and, third, that an action for damages in a state court is not among the modes prescribed.

It is true that §§ 8 and 9 deal with the redress of injuries resulting from violations of the act and give the person injured a right either to make complaint to the Interstate Commerce Commission or to bring an action for damages in a federal court, but not to do both. If the act said nothing more on the subject it well may be that no action for damages resulting from a violation of the act could be entertained by a state court. But the act shows that §§ 8 and 9 did not completely express the will of Congress as respects the injuries for which redress may be had or the modes in which it may be obtained, for § 22 contains this important provision: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." The three sections, if broadly construed, are not altogether harmonious, and yet it evidently is intended that all shall be operative. Only by reading them together and in connection with the act as a whole can the real purpose of each be seen. They often have been considered and what they mean has become pretty well settled. Thus we have held that a manifest purpose of the provision in § 22 is to make it plain that such "appropriate common law or statutory remedies" as can be enforced consistently with the scheme and purpose of the act are not abrogated or

displaced, *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 446–447; that this provision is not intended to nullify other parts of the act, or to defeat rights or remedies given by earlier sections, but to preserve all existing rights not inconsistent with those which the act creates, *Pennsylvania R. R. Co.* v. *Puritan Coal Co.*, 237 U. S. 121, 129; that the act does not supersede the jurisdiction of state courts in any case, new or old, where the decision does not involve the determination of matters calling for the exercise of the administrative power and discretion of the Interstate Commerce Commission, or relate to a subject as to which the jurisdiction of the federal courts is otherwise made exclusive, *ibid.* 130; that claims for damages arising out of the application, in interstate commerce, of rules for distributing cars in times of shortage, call for the exercise of the administrative authority of the Commission where the rule is assailed as unjustly discriminatory, but where the assault is not against the rule but against its unequal and discriminatory application, no administrative question is presented and the claim may be prosecuted in either a federal or a state court without any precedent action by the Commission, *ibid.* 131–132; and that, if no administrative question be involved, as well may be the case, a claim for damages for failing upon reasonable request to furnish to a shipper in interstate commerce a sufficient number of cars to satisfy his needs, may be enforced in either a federal or a state court without any preliminary finding by the Commission, and this whether the carrier's default was a violation of its common law duty existing prior to the Hepburn Act of 1906, or of the duty prescribed by that act,[1] *ibid.* 132–135; *Eastern Ry. Co.* v. *Littlefield*, 237 U. S. 140, 143; *Illinois Central R. R. Co.* v. *Mulberry*

---

[1] "Sec. 1. . . . and the term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, . . . ; and it shall be the duty of every carrier subject

*Hill Coal Co.*, 238 U. S. 275, 283; *Pennsylvania R. R. Co.* v. *Clark Coal Co.*, 238 U. S. 456, 472.

Applying these rulings to the case in hand, we are of opinion that a state court could entertain the action consistently with the Interstate Commerce Act. Not only does the provision in § 22 make strongly for this conclusion, but a survey of the scheme of the act and of what it is intended to accomplish discloses no real support for the opposing view. With the charge of unjust discrimination eliminated, the ground upon which a recovery was sought was that for a period of four years, during which the conditions were normal, the carrier had failed upon reasonable demand to supply to a shipper in interstate commerce a sufficient number of cars to transport the output of the latter's coal mine. Assuming that the conditions were normal and the demand reasonable, it was the duty of the carrier to have furnished the cars. That duty arose from the common law up to the date of the amendatory statute of 1906, known as the Hepburn Act, and thereafter from a provision in that act which, for present purposes, may be regarded as merely adopting the common law rule. There was evidence tending to show, and the jury found, that the conditions in the coal trade were normal and the demand for the cars reasonable. Indeed, without objection from the carrier, the court said when charging the jury: "There is no testimony disputing the claim of the plaintiff that these were normal times." The carrier insisted and the jury found that the carrier had a generally ample car supply for the needs of the coal traffic under normal conditions, and the jury further found that the failure to furnish the cars demanded was without justifiable excuse. Thus far it is apparent that no administrative question was involved—nothing which the act intends shall be passed upon by the

---

to the provisions of this Act to provide and furnish such transportation upon reasonable request therefor, . . . " c. 3591, 34 Stat. 584.

Commission either to the exclusion of the courts or as a necessary condition to judicial action.

But there was testimony tending to show that the carrier was applying or following a rule for allotting cars which did not entitle the coal company to receive as many cars as it needed and requested, and because of this it is contended that the reasonableness of this rule was in issue and was an administrative question which the act intends that the Commission shall solve. We cannot accede to the contention. The conditions in the coal trade being normal, as just shown, the number of cars to which the coal company was entitled was to be measured by its reasonable requests based upon its actual needs. It is only in times of car shortage resulting from unusual demands or other abnormal conditions, not reasonably to have been foreseen, that car distribution rules originating with the carrier can be regarded as qualifying or affecting the right of a shipper to demand and receive cars commensurate in number with his needs. *Pennsylvania R. R. Co.* v. *Puritan Coal Co.*, 237 U. S. 121, 133. Such a rule being inapplicable in the conditions existing at the time, the rule mentioned in the testimony could not be a factor in the decision of the case, and whether in a time of unforeseen car shortage it would be reasonable or otherwise was not then material.

Upon the trial the carrier offered to prove by a witness then under examination . . . "that during all of the period of this action the defendant had in effect . . . through routes and joint rates to points outside the State of Pennsylvania on the lines of other common carriers; that it was obliged to permit cars loaded by its shippers with bituminous coal consigned to such points outside the State of Pennsylvania to go through to destination, even when on the lines of other railroad companies; that as a result of doing this it had continuously throughout the period of this action a large number of cars off its own lines

and on the lines of other common carriers, which cars would otherwise have been available for shippers of coal on the railroad lines of the defendant and these cars if not on other railroad lines would have increased the equipment available for distribution to the plaintiff's mine and would consequently have diminished the damage which plaintiff claims to have sustained by reason of the fact that it did not receive more cars than it did receive."

But on the coal company's objection the evidence was excluded. We think the ruling was right. The offer did not point to any unusual or abnormal condition, not reasonably to have been foreseen, but, on the contrary, to a situation which was described as continuous throughout the four year period to which the action relates. It did not indicate that this condition was even peculiar to that period, or was caused by an extraordinary volume of coal traffic or an unusual detention of cars on other lines of railroad, or that it was other than a normal incident of the coal transportation in which the carrier was engaged. Without doubt the cars of this carrier when loaded with coal often went forward to destinations on the lines of other carriers. It is common knowledge that coal transportation has been conducted quite generally in this way for many years. Besides, a carrier extensively engaged in such transportation from mines along its lines, as this one was, naturally would expect to have a considerable number of cars on other lines in the ordinary course of business. Although possibly having a bearing upon the adequacy of the supply of cars provided by the carrier for the coal business as a whole,—a matter not within the contemplation of the offer,—it is certain that what was proposed to be proved had no tendency to show that the carrier had supplied to the coal company the number of cars to which it was entitled or to mitigate the carrier's default in that regard.

*Judgment affirmed.*