721 F.2d 1199
 115 L.R.R.M. (BNA) 2006, 1984 A.M.C. 1240,
99 Lab.Cas. P 10,713
 CALIFORNIA CARTAGE COMPANY, INC., Containerfreight Terminals
Company, and Hawaiian Pacific Freight Forwarding,
Petitioners-Appellants,
v.
UNITED STATES of America, and Federal Maritime Commission,
Respondents- Appellees,
Pacific Maritime Association, and International
Longshoremen's and Warehousemen's Union, Intervenors.
 No. 83-7102.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1983.
Decided Dec. 12, 1983.
 
 Louis E. Wolcher, David W. Slaby, Samuel Wong, Pettit & Martin, San Francisco, Cal., for petitioners-appellants.
 Gordon Shaw, Federal Maritime Commission, Washington, D.C., Norman Leonard, R. Frederic Fisher, San Francisco, Cal., for respondents-appellees.
 On Petition for Review of an Order of the Federal Maritime Commission.
 Before SKOPIL and PREGERSON, Circuit Judges, and MARQUEZ,* District Judge.
 SKOPIL, Circuit Judge:
 
 INTRODUCTION
 
 1
 Petitioners California Cartage Company ("Cal Cartage"), Containerfreight Terminals Company ("Containerfreight"), and Hawaiian Pacific Freight Forwarding ("Hawaiian Pacific") seek review of the Federal Maritime Commission's ("FMC's") order denying them standing to challenge an agreement between the Pacific Maritime Association ("PMA")[1] and the International Longshoremen's and Warehousemen's Union ("ILWU"). The FMC held that petitioners were not within the zone of interests protected by section 814 of the Shipping Act, 46 U.S.C. Sec. 801 et seq. as amended by the Maritime Labor Agreements Act of 1980, 94 Stat. 1021 (codified at 46 U.S.C. Secs. 801, 814 (fifth paragraph), and 841c) ("MLAA"). We reverse.
 
 FACTS
 
 2
 This case is part of the continuing struggle over mechanization and automation of cargo handling in the maritime shipping industry. Cargo handling was formerly labor intensive. With increased use of large, durable truck-and-trailer size shipping containers, the need for ILWU labor has decreased significantly.
 
 
 3
 Cargo was formerly brought to the docks in trucks. Each piece of cargo was taken from the truck, packed on pallets, and placed aboard the ship. Now most cargo is loaded into large shipping containers either by freight handling companies or by the owners of the cargo. The containers are then trucked to the docks and loaded onto specially designed ships. When the ship reaches its destination, the process is reversed. The containers are off-loaded and taken either to cargo handling facilities or directly to the purchaser of the cargo for emptying. The result has been a tremendous increase in efficiency. While cargo tonnage shipped in containers during the last 25 years increased 800 percent, ILWU hours worked dropped 50 percent.
 
 
 4
 The only segment of the process which remains labor intensive is the loading and emptying of the containers--"stuffing and stripping" in industry parlance. The ILWU has not retained control over labor used in stuffing and stripping. While ILWU labor is still utilized on the docks, the trend has been to locate stuffing and stripping operations, called container freight stations ("CFSs"), away from the docks allowing the employment of non-ILWU labor. Because of the high costs of ILWU labor, approximately 75 percent of all west coast container stuffing and stripping is performed at off-dock, non-ILWU CFSs. Of course, nearly all containers, regardless of where stuffed or stripped, pass through ILWU hands. ILWU labor is used to operate the dockside machinery in placing the containers aboard ship and removing them at their destination.
 
 
 5
 In 1981 the PMA and ILWU completed an agreement covering a wide variety of issues. A part of this agreement, later designated by the FMC as LM-81, was a method of raising money to partially cover fringe benefit costs of PMA members who operate on-dock CFSs. The aim of LM-81 was to retain existing work and recover work from non-ILWU off-dock CFSs.
 
 
 6
 Under LM-81 certain PMA members are to collect a fee from steamship lines ("carriers") by assessing each ton of containerized cargo loaded onto or discharged from vessels at west coast ports. The assessment is levied against all containers, whether stuffed and stripped at on-dock CFSs, off-dock CFSs, or by the shipper or consignee without the use of any CFS. The assessments are deposited in a fund. Periodic payments are made to PMA members who are on-dock, ILWU-manned CFS operators. The amount paid to each operator is based on the amount it has contributed to ILWU fringe benefit programs under a separate PMA-ILWU agreement which utilizes a man-hours worked computation.
 
 
 7
 The economic result is that a charge is levied against the carriers to help support on-dock CFS operations. The payments reduce the costs of on-dock CFSs, permitting them to reduce their prices. The on-dock CFSs are therefore better able to compete with the non-ILWU off-dock CFSs.
 
 
 8
 Petitioners, all off-dock CFS operators, objected to LM-81.
 
 PROCEEDINGS BELOW
 
 9
 LM-81 was filed by the PMA and ILWU with the FMC. Pursuant to 46 U.S.C. Sec. 814, the agreement was "deemed approved upon filing" subject to review by the commission "upon complaint filed." Cal Cartage filed its complaint against PMA with the FMC. Soon after, Hawaiian Pacific and Containerfreight jointly filed a complaint against PMA identical to Cal Cartage's. The complaints were consolidated and ILWU was granted leave to intervene by the administrative law judge ("ALJ").
 
 
 10
 The complaints alleged that LM-81 is a "maritime labor agreement" and not an "assessment agreement," and consideration of LM-81 was therefore outside the FMC's jurisdiction under the limitations of the Shipping Act, 46 U.S.C. Sec. 814, as amended by the MLAA. The complaints alleged in the alternative that if LM-81 was properly before the FMC, LM-81 violated parts of 46 U.S.C. Secs. 814, 815 and 816.
 
 
 11
 The ALJ concluded that LM-81 was outside the Commission's jurisdiction and not subject to the FMC's consideration. The full Commission reversed. It found that LM-81 was an "assessment agreement" as defined in section 814[2] and therefore was properly before the Commission. Petitioners do not challenge this ruling.
 
 
 12
 The Commission then considered whether the complaints raised sufficient allegations of Shipping Act violations to overcome PMA's arguments that the complaints failed to state a claim. It ruled that the complaints made out a claim under the Shipping Act against PMA's enforcement of LM-81.
 
 
 13
 Finally, the Commission considered whether petitioners had standing to challenge an agreement to which they are not parties and under which they are not liable for assessments. The FMC ruled that petitioners lacked standing to sue because "[p]arties so removed from the operative effects of an assessment agreement are outside the classes of interests protected by the statute." The statute the FMC referred to is the Shipping Act, 46 U.S.C. Sec. 801 et seq., as amended by the MLAA.
 
 
 14
 Petitioners ask the court to reverse the FMC's order dismissing their complaints for lack of standing and to remand the case to the FMC for a decision on the merits of their Shipping Act claims.
 
 STANDARD OF REVIEW
 
 15
 A reviewing court must set aside agency action found to be arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A). This case involves the FMC's interpretation of a statute which the FMC has responsibility for implementing and for which the FMC actively lobbied when it was considered by Congress. "The interpretation of a statute by an agency charged with its enforcement is a substantial factor to be considered in construing the statute." Miller v. Youakim, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979), quoting Youakim v. Miller, 425 U.S. 231, 235-36, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976). But the courts are the final authorities on issues of statutory construction. Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). We "are not obliged to stand aside and rubber-stamp ... affirmance of administrative decisions...." National Labor Relations Board v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia...." American Ship Building Co. v. National Labor Relations Board, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965).
 
 DISCUSSION
 
 16
 The Shipping Act as amended by the MLAA provides a cause of action to challenge assessment agreements which have been filed with the FMC.
 
 
 17
 The Commission shall, upon complaint filed ..., disapprove, cancel, or modify any such agreement, or charge or assessment pursuant thereto, that it finds, after notice and hearing, to be unjustly discriminatory or unfair as between carriers, shippers, or ports, or to operate to the detriment of the commerce of the United States.
 
 
 18
 46 U.S.C. Sec. 814 (fifth paragraph).
 
 
 19
 The question is whether petitioners have standing to utilize this cause of action.
 
 A. Standing
 
 20
 Under the Shipping Act, as amended, there is only a private cause of action to challenge assessment agreements. The FMC has been precluded from challenging assessment agreements on its own. See S.Rep. No. 854, 96th Cong., 2d Sess. 13, U.S.Code Cong. & Admin.News 1980, 2447 (1980). Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and progeny are therefore inapplicable. Those cases create a test for determining whether any, rather than which, private party has a cause of action under a substantive statute.
 
 
 21
 Once it is determined that a private cause of action exists, the question of standing for a particular person is decided by judging
 
 
 22
 whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question.
 
 
 23
 Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).[3] The "zone of interests" test for standing is a generous one. One seeking standing need only assert an interest which is "arguably" within the zone protected by the statute. Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153-54, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970); Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 142 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). While the zone of interests test does not encompass every aspect of standing, see Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 759-60; Fentron Industries v. National Shopmen Pension Fund, 674 F.2d 1300, 1304 (9th Cir.1982), it is determinative with respect to the only aspect of standing relevant in this case.
 
 B. Legislative History
 
 24
 Historically, the FMC held it did not have jurisdiction over maritime collective bargaining agreements under the Shipping Act of 1916, which required that certain maritime agreements be filed with and approved by the Commission. In 1968, however, the Supreme Court ruled that the FMC had too narrowly defined its jurisdiction under the Shipping Act. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 277, 88 S.Ct. 929, 938, 19 L.Ed.2d 1090 (1968) ("Volkswagen"). As a result of Volkswagen, maritime collective bargaining agreements were required to go before the FMC for approval under the standards of the Shipping Act.
 
 
 25
 As a consequence of Volkswagen, collective bargaining in the maritime industry was seriously disrupted. The parties did not know whether they had made an agreement until the Commission approved it, usually following lengthy hearings and sometimes litigation. The maritime industry was thus deprived of the benefits of the national policy of free collective bargaining without governmental intervention. The results of Volkswagen met with criticism from nearly everyone in the maritime industry, whether labor or management, and including the FMC.
 
 
 26
 As a direct response to Volkswagen, Congress enacted the MLAA, which amended the Shipping Act. The purpose of the MLAA was essentially to restore the FMC to its pre-Volkswagen role, removing jurisdiction to regulate collective bargaining agreements. The MLAA made all collective bargaining and related agreements completely exempt from FMC jurisdiction under the Shipping Act, except for agreements for the funding of fringe benefits on other than a uniform man-hour basis--so called assessment agreements. The MLAA established a procedure for filing and, if there are complaints, review of these agreements by the Commission. Retention of jurisdiction over assessment agreements was thought necessary to "ensure equal treatment of shippers, cargo and localities and to prevent abuses made possible by concerted activity of ocean carriers and others." S.Rep. No. 854 at 2 and 13, U.S.Code Cong. & Admin.News 1980, at 2448 (1980).
 
 C. Petitioners' Arguments
 
 27
 Petitioners first argue that section 821 of the Shipping Act gives them standing to complain of the assessment agreement, unaffected by the changes to section 814 by the MLAA. Second, they argue that even if section 814 modifies section 821 with regard to standing, they are still within the "zone of interests" created by section 814's "detriment to commerce" test.[4]
 
 
 28
 (1) Sections 821 and 814.
 
 
 29
 Section 821 of the Shipping Act, both before and after the MLAA, permits anyone to raise claims of violations of the Shipping Act's substantive provisions with the FMC: "Any person may file with the Federal Maritime Commission a sworn complaint setting forth any violation of this chapter...." 46 U.S.C. Sec. 821. This statement of standing is followed by procedures for filing such complaints. Section 821 also gives the FMC authority to initiate complaint proceedings on its own motion.[5] The FMC's power to initiate challenges to agreements does not extend to assessment agreements. See S.Rep. No. 854 at 13.
 
 
 30
 The MLAA amendments to the Shipping Act at section 814 created a separate procedure for challenging assessment agreements. Unlike other agreements which must be filed with the FMC,[6] assessment agreements are "deemed approved upon filing with the Commission."[7] 46 U.S.C. Sec. 814. Section 814 also provides for remedies should the Commission decide an assessment agreement is either discriminatory or is a detriment to commerce.
 
 
 31
 None of the MLAA amendments indicate who may file complaints against assessment agreements. Petitioners argue that the generous standing provisions of section 821 remain effective for all Shipping Act challenges, including challenges to assessment agreements.
 
 
 32
 Rules of statutory construction hold that repeals by implication are not favored. Congress' intent to repeal an existing provision should be clear. E.g., T.V.A. v. Hill, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). "Only a clear repugnancy between the old ... and the new [law] results in the former giving way...." United States v. Borden Co., 308 U.S. 188, 198-99, 60 S.Ct. 182, 188-89, 84 L.Ed. 181 (1939). In practical terms, this rule means that "in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." Morton v. Mancari, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974).
 
 
 33
 Congress, when enacting the MLAA, did not repeal or modify section 821 and did not specifically mention standing under section 814. Under rules of statutory interpretation, we must presume that standing is controlled by section 821.
 
 
 34
 The Commission reasoned that section 814 created a separate complaint procedure with implicit standing requirements more vigorous than section 821's. The Commission then looked to the clause of section 814 which reads: "[t]o the extent that any provision of this paragraph conflicts with the language of or any other section of this act ... this paragraph shall control...." The Commission ruled that section 814's implicit standing requirement preempted those specified in section 821.
 
 
 35
 The Commission's reliance on the preemption clause of section 814 is not persuasive. The clause refers to conflicts between provisions of 814 and 821. The two provisions are not in apparent conflict with regard to standing. The preemption clause was intended to give the FMC discretion to fashion appropriate remedies apart from the restrictions of the remedies provision of the unamended Shipping Act, including section 821. S.Rep. No. 854 at 14.[8] The legislative history does not suggest that the preemption clause was intended to affect the standing provision of section 821.
 
 
 36
 (2) Zone of Interests of Section 814.
 
 
 37
 Neither are we persuaded that section 814's substantive standards implicitly remove standing from all but carriers, shippers and ports. The FMC has authority to disapprove, cancel, or modify any assessment agreement which it finds to be "unjustly discriminatory or unfair as between carriers, shippers or ports, or to operate to the detriment of the commerce of the United States." 46 U.S.C. Sec. 814 (emphasis added).
 
 
 38
 The statutory provision on its face gives the FMC authority over assessment agreements to prevent two kinds of harm. Petitioners do not, and could not, assert standing to contest LM-81 because it is allegedly discriminatory. Petitioners argue they have standing to contest LM-81 because it is allegedly detrimental to commerce. We see nothing in the statute which restricts standing to enforce the standard upon which petitioners rely.[9]
 
 
 39
 The Commission argues that protections for the commerce of the United States may only be raised by carriers, shippers or ports. It reasons that antitrust considerations are beyond the scope of the Commissioner's jurisdiction, and injury to competitive position is therefore not contemplated by the detriment to commerce standard. It concludes that petitioners' complaint is based on an injury to their competitive position, and therefore they are not protected by the detriment to commerce standard and have no standing. Neither the FMC nor intervenors, however, suggest what values are to be protected by the detriment to commerce standard.[10]
 
 
 40
 There is some merit to the Commission's position. According to the legislative history:
 
 
 41
 The primary reason for subjecting these agreements to FMC scrutiny upon complaint is to insure that all affected parties pay only their fair share of fringe benefit obligations. Antitrust considerations are not a factor to be weighed by the Commission in evaluating these agreements....
 
 
 42
 S.Rep. No. 854 at 13-14.
 
 
 43
 While protection of those liable for assessments may have been the "primary" consideration, it was not the only consideration. Even though Congress wanted to eliminate consideration of pure "antitrust" factors, it does not necessarily follow that Congress wanted to eliminate consideration of all impacts an assessment agreement might have on competition. The legislative history indicates Commission jurisdiction over these agreements was necessary to "prevent abuses made possible by concerted activity of ocean carriers and others." S.Rep. No. 854 at 2 and 13, U.S.Code Cong. & Admin.News 1980, 2448. Antitrust law limitations do not encompass all possible impacts on competition that may result in a "detriment to commerce."
 
 
 44
 All agreements must be non-discriminatory as between carriers, shippers and ports, and must not operate to the detriment of commerce. All agreements except assessment agreements are subject to the additional requirement of not being "contrary to the public interest." Compare 46 U.S.C. Sec. 814 (fifth paragraph) with Sec. 814 (second paragraph). The "public interest" within the meaning of section 814 (second paragraph) includes the national policy embodied in the antitrust laws. See Volkswagen, 390 U.S. at 273-74, 88 S.Ct. at 936-37; Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 244-45, 88 S.Ct. 1005, 1009-10, 19 L.Ed.2d 1071 (1968). Under the MLAA Congress chose not to extend this requirement to assessment agreements and eliminated the "public interest" standard with regard to such agreements. It does not follow that Congress also stripped away protections for the commerce of the United States whenever an assessment agreement also has anticompetitive effects.
 
 
 45
 Granting petitioners standing in this case will not defeat the purpose of the MLAA, as the Commission suggests. The MLAA was intended to restore order and some certainty to the collective bargaining process. S.Rep. No. 854 at 1. Because of Volkswagen, collective bargaining agreements and assessment agreements had to be approved by the FMC. Under the Shipping Act, such agreements were illegal until the FMC had specifically approved them. It was the delay in approval that disrupted labor relations. The MLAA eliminated the problem with regard to most collective bargaining agreements by exempting them from coverage under the Shipping Act. The MLAA also eliminated the problem with regard to assessment agreements by deeming them approved automatically upon filing. Granting standing to petitioners will not alter that. The assessment agreement will be operative unless and until the FMC specifically concludes it is a detriment to commerce.
 
 
 46
 Petitioners are well placed to raise the issue of an assessment agreement's detrimental impacts on commerce. Petitioners are parts of the system of carriers and freight handlers which facilitate the flow of goods. Had Congress left it within the power of the FMC to challenge assessment agreements on its own motion we might have assumed that there was no private right of action to enforce what appears to be a protection of the public's interests. As enacted, the MLAA left it to private parties to enforce the detriment to commerce standard. We hold that petitioners, as part of the network that makes up waterborne commerce, are within section 814's zone of protected interests and have standing to challenge an assessment agreement under the detriment to commerce standard.CONCLUSION
 
 
 47
 The FMC's interpretation of the Shipping Act, as amended, is unjustified in light of the rules of statutory construction, the legislative history of the MLAA, and the statutory language. The decision of the FMC is reversed and the case is remanded for consideration of the merits of petitioners' claims.
 
 
 48
 REVERSED AND REMANDED.
 
 
 
 *
 The Honorable Alfredo C. Marquez, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The Pacific Maritime Association is an employer organization of over 100 principal common carriers by water, stevedoring contractors, and marine terminal operators, representing the Pacific Coast shipping industry. The primary function of the PMA is to negotiate and administer collective bargaining contracts with unions representing its members' employees, of which the International Longshoremen's and Warehousemen's Union is one
 
 
 [2]
 46 U.S.C. Sec. 814 gives the FMC jurisdiction over certain aspects of "assessment agreements." Such agreements are implicitly defined in the fifth paragraph of section 814, which provides that:
 Assessment agreements, whether part of a collective bargaining agreement or negotiated separately, to the extent they provide for the funding of collectively bargained fringe benefit obligations on other than a uniform man-hour basis, regardless of the cargo handled or type of vessel or equipment utilized, shall be deemed approved upon filing with the Commission.
 
 
 [3]
 Petitioners' assertions that they have suffered "injury in fact" are insufficient to establish standing. While injury in fact is a crucial element of standing, petitioners must also satisfy the "zone of interest" test set out in text. Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 759-60; Fentron Industries, 674 F.2d at 1304
 
 
 [4]
 Petitioners also argue that Hawaiian Pacific was, for a time, a "shipper," and therefore has standing under section 814 even aside from the detriment to commerce test. Petitioners also raise an issue regarding standing to challenge the assessment agreement as a "matter required to be set forth in a tariff...." See 46 U.S.C. Sec. 821
 Neither of these contentions is properly before the court. Petitioners' argument that Hawaiian Pacific was a "shipper" was never raised before the FMC. Nor did petitioners challenge the conclusion of the ALJ that "none of the parties nor the evidence indicate the ... [assessment agreement] invokes rates, charges, regulations or practices which are required to be set forth in a tariff." Issues not taken up before the agency are not properly raised on appeal. See United States v. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); Ducanson-Harrelson Co. v. Director, Office of Workers' Compensation Programs, 644 F.2d 827, 832 (9th Cir.1981).
 
 
 [5]
 "The Commission, upon its own motion, may in like manner and, with the same powers, investigate any violation of this chapter." 46 U.S.C. Sec. 821(b)
 
 
 [6]
 All other agreements which must be filed with the FMC require affirmative action by the Commission before approval is attained. Until approved, whether automatically in the case of assessment agreements or by affirmative action in the case of other agreements, implementation is unlawful. 46 U.S.C. Sec. 814
 
 
 [7]
 Approval of an agreement has at least one significant collateral effect. Section 814 (sixth paragraph) provides that "[e]very agreement, modification, or cancellation lawful under this section ... shall be excepted from provisions of the ... [antitrust laws]." This provision has been interpreted to mean that agreements which are "approved" by the Commission are immune from antitrust challenges. E.g., Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 216-17, 86 S.Ct. 781, 783-84, 15 L.Ed.2d 709 (1966)
 No case has yet interpreted the antitrust immunity provision in the context of an automatically approved assessment agreement. We need not do so here. We note, however, that denial of standing to petitioners might well have the effect of conferring antitrust immunity on an agreement that violates the Shipping Act.
 
 
 [8]
 "The last sentence of ... [section 814] is intended to give the Commission broad discretion, unfettered by the constraints of sections 18, 22 and other provisions of the Shipping Act, to fashion appropriate remedies for unfair or discriminating assessments." S.Rep. No. 854 at 14
 
 
 [9]
 The third element of the Fentron test is therefore satisfied: "In order to have standing to sue for violations of a federal statute, a plaintiff must: (1) suffer an injury in fact; (2) fall arguably within the zone of interests protected by the statute allegedly violated; and (3) show that the statute itself does not preclude the suit." Fentron Industries, 674 F.2d at 1304
 
 
 [10]
 We are presented only with the threshold question of standing and therefore need not attempt to give complete content to the detriment to commerce standard. While case law is vague, it is at least clear that detriment to commerce is a standard independent of other substantive standards of the Shipping Act. See Aktiebolaget, 390 U.S. at 244, 88 S.Ct. at 1009; National Association of Recycling Industries, Inc. v. Federal Maritime Commission, 658 F.2d 816, 827-28 (D.C.Cir.1980); Federal Maritime Commission v. New York Terminal Conference, 373 F.2d 424, 427-28 (1967)