**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FULFILLMENT SERVICES INC.,
          *Plaintiff-Appellant,*

v.

UNITED PARCEL SERVICE, INC.
(UPS-Parent); UNITED PARCEL
SERVICE, INC. (UPS-NY); and
UNITED PARCEL SERVICE, INC.
(UPS-OH),
          *Defendants-Appellees.*

No. 06-15970

D.C. No.
CV-05-00538-DCB

FULFILLMENT SERVICES INC.,
          *Plaintiff-Appellee,*

v.

UNITED PARCEL SERVICE, INC.
(UPS-Parent); UNITED PARCEL
SERVICE, INC. (UPS-NY); and
UNITED PARCEL SERVICE, INC.
(UPS-OH),
          *Defendants-Appellants.*

No. 07-15006

D.C. No.
CV-05-00538-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
February 13, 2008—San Francisco, California

Filed June 9, 2008

Before: Barry G. Silverman, M. Margaret McKeown, and
Richard C. Tallman, Circuit Judges.

6489

Opinion by Judge McKeown

**COUNSEL**

Paul D. Cullen, Sr., The Cullen Law Firm, Washington, District of Columbia, for the plaintiff-appellant-cross-appellee.

Gregory B. Koltun, Morrison & Foerster LLP, Los Angeles, California, for the defendants-appellees-cross-appellants.

## OPINION

McKEOWN, Circuit Judge:

The Interstate Commerce Act ("ICA") was adopted to bring uniformity to shipping regulations previously governed by inconsistent state laws. George W. Wright, *Slouching Toward a Morass: The Case For Preserving Complete Carmack Preemption*, 1 DePaul Bus. & Com. L.J. 177 (2003). Historically, the Interstate Commerce Commission had responsibility for enforcing the ICA. Continuing the deregulation initiatives begun in the 1970s and early 1980s, in 1995 Congress passed the Interstate Commerce Termination Act ("Termination Act"), which abolished the Interstate Commerce Commission and transferred primary responsibility for enforcement of the ICA to the Surface Transportation Board (the "Board"). The Motor Carrier Act ("MCA") is among the ICA provisions whose enforcement was transferred under the Termination Act.

This case concerns the availability of a private civil remedy for violations of the MCA, specifically establishment of shipping rates in the trucking industry. In particular, we consider whether, under § 14704(a)(2), a private party can sue for violations of § 13703. *See* 49 U.S.C. § 14704(a)(2); 49 U.S.C. § 13703. We hold that § 14704(a)(2) provides for a private cause of action, but that a plaintiff must allege actual damages arising from the violation in order to state a claim successfully.

### BACKGROUND

United Parcel Service ("UPS") describes itself as "the world's largest package delivery company." As a motor carrier transporting goods interstate, UPS is subject to the jurisdiction of the Secretary of Transportation and the Board and is governed by certain substantive provisions of the MCA. *See* 49 U.S.C. § 13501. Fulfillment Services, Inc., a freight ship-

ping company, alleges that UPS violated one of these provisions, namely 49 U.S.C. § 13703.

Section 13703 provides that a motor carrier "may enter into an agreement with one or more [other] carriers to establish . . . joint rates," and that such agreements "may be made and carried out . . . and the antitrust laws . . . do not apply to parties or other persons with respect to making or carrying out the agreement." 49 U.S.C. § 13703(a)(1), (6). Subsection (f) requires that "[a] motor carrier . . . whose . . . rates [or] classifications . . . are determined or governed by publications established under agreements approved under this section *must participate in the determining or governing publication* for such provisions to apply." 49 U.S.C. § 13703(f) (emphasis added). In other words, § 13703 provides an exception from antitrust liability to carriers for collective rate and classification setting, provided they meet certain conditions. The subject of this appeal is UPS's "Hundredweight Service," which Fulfillment alleges runs afoul of § 13703(f).

According to UPS, its Hundredweight Service entitles shippers to lower rates if they send multiple packages to the same location on the same day. At the time UPS introduced its Hundredweight Service in 1988, it participated in the National Motor Freight Classification ("NMFC"), a collectively compiled rate classification publication covered by § 13703. Through item 2000 of its General Tariff, UPS incorporated the NMCF's 100 Series ("NMCF Classification") as part of its pricing mechanism, and referenced the NMCF Classification in the published rates for its Hundredweight Service. In October 2000, UPS ceased participating in the NMCF, and stopped listing NMCF as a "governing publication." Notwithstanding these changes, UPS's Hundredweight Service tariffs continued to refer to the NMCF Classification until mid-2004.

Under the NMFC Classification, commodities carried by truck have a "classification rating" ranging from class 50 to class 500, based primarily on their density. Articles with the

heaviest density, such as books and ingots, fall in Class 50, whereas the lightest items, such as ping pong balls, are assigned Class 500. Fulfillment claims that UPS's tariff, even after it withdrew from NMFC publication, continued to refer to classes 50-125 and that UPS restricted its Hundredweight Service to commodities in those classes.[1]

Fulfillment filed this putative class action on behalf of itself and others who shipped parcels using UPS's Hundredweight Service between October 28, 2000, and July 14, 2004, claiming that UPS's continued reference to the NMCF Classification violated § 13703(f). The suit asked for a declaratory judgment that Item 2000 of UPS's tariff became void and unenforceable when UPS withdrew from participation in NMCF. Fulfillment also sought relief under 49 U.S.C. § 14704(a)(2), alleging that this provision allows private parties to sue for violations of the MCA, including violations of § 13703.

The district court granted UPS's motion to dismiss because "liability under § 13703 does not extend beyond antitrust violations." The district court denied UPS's motion for attorney's fees under 49 U.S.C. § 14707(e), holding both that it lacked jurisdiction to award fees, because it had dismissed the underlying suit for lack of standing, and that § 14707(e) requires only that attorney's fees be awarded to prevailing plaintiffs, not defendants such as UPS. Fulfillment now appeals the dismissal of its suit, and UPS cross appeals the denial of attor-

---

[1]The result, according to Fulfillment, was to limit service under low rates to the heaviest items and avoid transporting bulky but light commodities like ping pong balls. Although UPS disputes that its Hundredweight Service tariff was limited to these classes or was determined with reference to the NMFC, we do not address this factual challenge at this stage of the proceedings. Instead, on this motion to dismiss, we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

ney's fees. We affirm the district court, although we differ in our analysis.

## ANALYSIS

### I. STANDING

This case was briefed to us as presenting the question whether Fulfillment stated a claim under § 13703. Only in a supplemental submission just before oral argument did UPS shift ground and seek to cast its argument in terms of standing. Of course, we do not rely on the parties to raise an issue of standing. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("Standing is a threshold matter central to our subject matter jurisdiction. We must assure ourselves that the constitutional standing requirements are satisfied before proceeding to the merits.").

**[1]** The question of Article III standing "is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151-52 (1970) (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)). Although there are three requirements for Article III standing—injury, causation, and redressability—only the injury component is in serious contention here. *Vt. Agency of Natural Res. v. United States ex rel Stevens*, 529 U.S. 765, 771 (2000).

**[2]** To suffice for Article III standing, an injury must be "a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The injury required by Article III can exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, n.3 (1973)). "Essentially, the standing question in such cases is whether the constitutional or statutory provision

on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.*

Although in some cases, it may seem difficult to separate where standing ends and analysis of the cause of action begins, the Supreme Court has provided guidance on this point: "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The Court went on to note that the scope of a statutory right of action "goes to the merits and not to statutory standing." *Id.* at 92.

**[3]** Stripped to its essence, Fulfillment's claim is that UPS violated § 13703 by charging an unlawful rate and Fulfillment is entitled to an award of damages, including disgorgement.[2] Fulfillment's claim is founded on a colorable construction of the related statutes. Its alleged injury is being subjected to an unlawful tariff and, as in *Citizens for a Better Environment*, "[i]t would have been a different matter if the relief *requested* . . . would not have remedied their injury in fact; but it of course would." 523 U.S. at 96.

**[4]** To be certain, not all statutes endow rights on a given plaintiff, the infringement of which is sufficient to support standing. *See Fernandez v. Brock*, 840 F.2d 622, 630 (9th Cir. 1988) (stating that "a plaintiff who merely claims that a defendant violated a statutory duty does not necessarily satisfy the requirement of injury in fact in article III"). Neverthe-

---

[2]UPS suggests that Fulfillment's alternate assertion that UPS's rates were "void" is based on a misguided attempt to apply the outdated "void-for-non-participation" doctrine. Because the important aspect of Fulfillment's claim for standing purposes is that the rates were "unlawful," not that this characterization rendered them void, we need not delve into this dispute. Suffice it to say that Fulfillment alleges a violation of a statutory right.

less, as we explain below, because Congress has enacted specific legislation, namely § 14704(a), establishing a private cause of action for violations of the MCA, including violations of § 13703, we must infer that it intended § 13703 to create such rights. *See Cal. Cartage Co., Inc. v. United States*, 721 F.2d 1199, 1203 (9th Cir. 1983) (holding that once it is established that a private cause of action exists, our inquiry shifts from whether Article III standing exists to whether prudential standing concerns are satisfied).

**[5]** Neither is prudential standing a barrier to Fulfillment's claims. Most important here, the doctrine of standing "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute." *Ass'n of Data Processing*, 397 U.S. at 153. As a shipper subject to pricing arrangements governed by the MCA, Fulfillment's interest in being charged a legitimate tariff is precisely the sort of interest protected by § 13703. While § 13703 also serves to benefit motor carriers by creating a fair harbor for collective pricing arrangements, this scheme simply evidences that Congress sought to protect both interests, by striking a balance between the two.

## II. SECTION 14704(a) CREATES A PRIVATE CAUSE OF ACTION FOR VIOLATIONS OF § 13703

**[6]** We have previously held that § 14704(a)(2) creates a private cause of action for violations of the MCA and its attendant regulations, and neither party disputes this basic premise. *See Rivas v. Rail Delivery Serv., Inc.*, 423 F.3d 1079, 1082 (9th Cir. 2005); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 192 F.3d 778 (8th Cir. 1999). That § 13703 also implicates the antitrust laws provides no reason for departing from this general rule.

The district court found that "liability under § 13703 does not extend beyond antitrust violations." Reasoning that "Con-

gress struck a delicate balance when it adopted § 13703, excepting certain agreements from antitrust liability," the district court explained:

> The agreement requirements contained in § 13703 . . . serve the purpose of the statute, which is to provide an exemption from antitrust liability for agreements that comply with the very specific provisions of the statute for securing such an exemption. Imposing further liability, as Fulfillment suggests exists under § 14704(a)(2), goes beyond the narrow purpose of § 13703, constrains contractual freedom, and is contrary to the policies and principles behind deregulations.

**[7]** Rather than examining the policies and principles behind the Termination Act and the antitrust laws, of which there are no doubt many, our analysis begins with the text that Congress actually enacted. In this case, the text of § 14704(a)(2) provides no basis to distinguish between violations of § 13703(f) and violations of other provisions of the MCA. Section 14704(a)(2) reads simply: "A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." 49 U.S.C. § 14704(a)(2). Although Congress may have had different purposes in enacting different provisions of the MCA, the plain language of § 14704(a)(2) provides equally a damages remedy for "an act or omission . . . in violation" of the MCA, without discriminating as to provisions under the Act.

The Eighth Circuit's analysis in *New Prime* is not, as UPS has suggested and the district court found, to the contrary. *New Prime*, 192 F.3d 778. In *New Prime*, the court held that "§ 14704(a) authorizes private actions for damages and injunctive relief to remedy *at least some* violations of the Motor Carrier Act and its implementing regulations." *Id.* at

785 (emphasis added). UPS has latched onto the word "some" in this passage as evidence that not every violation of the MCA is actionable under § 14704(a)(2). But UPS misreads this language.

The plaintiff in *New Prime* sought both an injunction under § 14704(a)(1) and damages under § 14704(a)(2). *Id.* at 784-85. Section 14704(a)(1), a provision not at issue in this case, allows suits for injunctions against "violations of sections 14102 and 14103." 49 U.S.C. § 14704(a)(1). The defendant claimed that some of the regulations it was accused of violating were not promulgated under § 14102 or § 14103, and thus were outside the scope of § 14704(a)(1). *New Prime*, 192 F.3d at 784. The court held that question was not properly before it, but included the caveat that § 14704(a) allows suits to enforce "at least some" violations of the Motor Carrier Act and its regulations. *Id.* at 785. In other words, the "at least some" language was meant to reserve judgment on the availability of § 14704(a)(1) injunctions for violations of regulations promulgated outside of § 14102 or § 14103. This language has no bearing on the scope of § 14704(a)(2).

**[8]** In sum, the plain language of § 14704(a)(2) counsels that there is a private right of action for violations within that part of the Termination Act, without limitation as to whether the claim rests on an antitrust violation. The alleged tariff violation here falls squarely within the statute.

### III.   FAILURE TO STATE A CLAIM UNDER § 14704(a)(2)

**[9]** Although § 14704(a)(2) does not limit claims to particular provisions of the MCA, neither does it allow suits for abstract violations; to state a claim, a plaintiff must still allege damages as a consequence of the violation. By its terms, § 14704(a)(2) only makes carriers liable "for damages sustained by a person." 49 U.S.C. § 14704(a)(2). Fulfillment's claim that Congress has provided a "statutory penalty" for violations of § 13703(f)(1)(B)(i), and that Congress intended

§ 14704(a) to transfer the Interstate Commerce Commission's power to award restitution to shippers to the shippers themselves, is belied by the text of § 14704(a)(2).

The Supreme Court has been clear that damages do not include restitution or penalties, but rather are based on the extent of the injury actually suffered. *Penn. R.R. Co. v. Int'l Coal Mining Co.*, 230 U.S. 184, 204 (1913) ("The statute [an earlier version of the ICA] gives a right of action for *damages* to the *injured* party, and by the use of these legal terms clearly indicated that the damages recoverable were those known to the law and intended as compensation for the injury sustained."). A close examination of Fulfillment's complaint and briefing reveals that although it uses the term "damages," in effect Fulfillment seeks disgorgement of UPS's "unlawful" tariff or a penalty similar to what the Interstate Commerce Commission could have imposed. Because Fulfillment alleges only restitution and penalties, it has alleged no damages, and therefore failed to state a claim. *See Doe v. Chao*, 540 U.S. 614, 624-25 (2004) ("[A]n individual subjected to an adverse effect . . . without more has no cause of action for damages.").

**[10]** Fulfillment points to § 13103 to plug this hole in its claim. That provision, although called a "savings" clause, cannot save Fulfillment's claim. Section 13103 states: "Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." 49 U.S.C. § 13103. Even if § 13103 were read to allow a court to impose equitable or other remedies in the event of a successful § 14704(a)(2) claim, the provision does not eliminate § 14704(a)(2)'s basic requirement that a plaintiff allege damages. In other words, the plain language of § 14704(a)(2) requires a plaintiff allege damages, regardless of whether other remedies may also be available under § 13103.

**[11]** In any event, Fulfillment's position suffers from another, equally fatal, flaw: § 13103 does not even appear to

allow courts to impose equitable remedies as an adjunct to damages under § 14704(a)(2). Nearly 100 years ago, the Supreme Court construed an earlier version of the ICA, which included language identical to that in § 13103:

> [W]e have held that a manifest purpose of the [savings clause] is to make it plain that such "appropriate common law and statutory remedies" as can be enforced consistently with the scheme and purpose of the act are not abrogated or displaced; that this provision is not intended to nullify other parts of the act, or to defeat rights or remedies given by earlier sections, but to preserve all existing rights not inconsistent with those which the act creates.

*Penn. R.R. Co. v. Sonmah Shaft Coal Co.*, 242 U.S. 120, 123-24 (1916) (internal citations omitted). The savings clause merely preserves the causes of action and remedies that already existed and do not conflict with the Act; it does not allow a plaintiff to seek equitable remedies under the new causes of action created by the Act nor does it create a free-standing remedy unhinged from the private cause of action under § 14704.

The Tenth Circuit explained this distinction in *Overbrook Farmers Union Coop. Ass'n v. Mo. Pac. R.R. Co.*, 21 F.3d 360 (10th Cir. 1994). There, a shipper alleged willful violations of an older version of the ICA related to rail carriage, under a provision containing language identical to that of § 14704(a)(2), and sought punitive damages. *Id.* at 362-63. The railroad argued that punitive damages were not authorized by the act, as the language allowed only for "damages sustained by a person," i.e. actual damages. *Id.* at 362. Overbrook, like Fulfillment, pointed to the savings clause, and argued that it preserved the common law right to seek punitive damages. *Id.* at 363. The court disagreed, holding that the savings clause preserved the plaintiff's right to seek state law or common law remedies, but only if the plaintiff brought a

separate claim based in state or common law. *Id.* at 364 ("At a minimum, before punitive damages can be imposed upon a carrier . . . the plaintiff must seek relief in addition to the statutory relief provided by [the ICA]."). In other words, the savings clause does not expand the remedies available under statutory claims, but merely preserves those available under preexisting rights of action.

[12] Fulfillment failed to state a claim because it failed to allege any actual damages. The suit was properly dismissed and thus we do not need to reach UPS's alternate arguments, including the claim that Fulfillment's action was untimely.

## IV.  ATTORNEY'S FEES

The only issue remaining for resolution is UPS's motion for attorney's fees. Despite dismissal of Fulfillment's claims, the district court found that UPS was not entitled to attorney's fees under § 14704(e). We agree, but again on a different rationale.

The district court characterized its dismissal of Fulfillment's claims as based on a lack of standing and, therefore, a lack of subject matter jurisdiction.[3] Without subject matter jurisdiction over the underlying claims, the district court reasoned, it was without jurisdiction to award attorney's fees. Because, as explained above, we hold that Fulfillment does have standing, the question of UPS's entitlement to attorney's

---

[3]The district court's basis for dismissing Fulfillment's claims is unclear. The order of April 19, 2006, appears to find that Fulfillment failed to state a claim under § 14704(a)(2), because its claim for damages was based on a violation of § 13703, a provision which the district court limited to relief via the antitrust statutes. The subsequent order denying attorney's fees, however, characterizes the rationale for dismissal as lack of standing and subject matter jurisdiction. Because we decide the attorney's fees question on a different basis, we do not need to sort out the precise contours of the district court's ruling on dismissal.

fees must be resolved under the attorney's fees provision: § 14704(e).

**[13]** Although "Congress legislates against the strong background of the American Rule. . . . that unless Congress provides otherwise, parties are to bear their own attorney's fees," Congress can override this rule with a clear expression of congressional intent to shift fees. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) (citations omitted). In the case of § 14704(e), without doubt Congress intended to deviate from the American Rule — hence the existence of the fee-shifting provision. What is less clear is exactly what Congress intended the new rule to be. Specifically at issue here is whether § 14704(e) applies only to successful plaintiffs, or whether it applies equally to successful defendants. The only other circuit court to consider this issue, albeit in the context of a different provision of the ICA, held that "the statutory scheme was designed to benefit plaintiffs and that the remedy provided in § 14704(e) must be read consistent with that" and thus only prevailing plaintiffs are eligible for fees under this provision. *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 398 F.3d 1067, 1071 (8th Cir. 2005) ("*New Prime II*").

**[14]** Section 14704(e) reads in relevant part: "The district court shall award a reasonable attorney's fee under this section." 49 U.S.C. § 14704(e). The statute says nothing about the prevailing party or about the plaintiff or the defendant. Viewing this text in isolation, one might mistakenly leap to the conclusion that it applies equally to plaintiffs and defendants. For that matter, one could just as easily read it to apply to both prevailing and defeated parties—a reading for which neither party advocates. Nevertheless, the Supreme Court's jurisprudence in this area cautions against such a simplistic approach, and a more comprehensive reading of the statute reveals its purpose. *See New Prime II* , 398 F.3d at 1069 (finding this provision ambiguous despite its superficial clarity).

**[15]** The Supreme Court has unfailingly counseled that fee-shifting provisions can only be understood in light of the goals and objectives of the underlying legislation. *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005) ("When applying fee-shifting statutes, 'we have found limits in the large objectives of the relevant Act, which embrace certain equitable considerations.' ") (quoting *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759 (1989)); *Fogerty*, 510 U.S. at 522-24 (relying on the differing purposes of the Civil Rights Act of 1964 and the Copyright Act to construe their nearly identically worded fee-shifting provisions differently); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418-19 (1978). This consideration is particularly important here because of the statutory ambiguity.

**[16]** To discover the scope of § 14704(e), we look to its context, just as the Supreme Court has done in earlier cases. In *Fogerty*, the Court distinguished fee-shifting provisions of the Copyright Act from those in Title VII of the Civil Rights Act of 1964 on the grounds that the latter statute was intended to provide incentives for litigants lacking the resources to act as "private attorney[s] general," whereas "entities which sue for copyright infringement as plaintiffs can run the gamut from corporate behemoths to starving artists." *Fogerty*, 510 U.S. at 524 (quoting *Cohen v. Va. Elec. & Power Co.*, 617 F. Supp. 619, 622-23 (E.D. Va. 1985)). The statute at issue here lies somewhere between the Civil Rights Act and the Copyright Act on this measure. While plaintiffs under § 14704 can range from individual shippers to international conglomerates, one of the purposes of the Termination Act was to shift enforcement of the MCA from the government to private parties.[4]

---

[4]The *New Prime II* court found that the purpose of the Truth in Leasing regulations, which were based on ICA provisions, was to correct imbalances in bargaining power, and that awarding fees to defendants would, therefore, be contrary to the purpose of the Termination Act. 398 F.3d at 1070. The court's analysis of the Termination Act's purpose focused on the purpose of the Truth in Leasing regulations. Because we conclude that § 14704(a)(2), and thus § 14704(e), applies to all violations of the Termination Act, we look to the purpose of the Termination Act as a whole, not just to the particular provision under which Fulfillment sued.

Several additional considerations tip the scale in favor of reading § 14704(e) as applicable only to successful plaintiffs. The title of § 14704 is "Rights and remedies of persons injured by carriers or brokers," indicating that the entire provision applies only to remedies available to plaintiffs. 49 U.S.C. § 14704. Although a title cannot override the plain language of a statute, it is nevertheless informative in the face of ambiguity. Also, the statute provides that the fee is to be awarded "under this section," which, in fact, relates to remedies for plaintiffs, not defendants.

Finally, as Fulfillment points out, because § 14704(e) is a mandatory fee-shifting provision, to construe it as applicable to both plaintiffs and defendants would impose the British Rule of "loser pays" via a fee-shifting statute. While imposition of the British Rule would be far from the "absurd result" that Fulfillment claims, we must nevertheless consider that this would be the consequence of UPS's proffered interpretation. Had Congress aspired to such a radical departure, it no doubt would have so indicated with explicit language to that effect. *See Fogerty*, 510 U.S. at 534 ("[W]e find it impossible to believe that Congress, without more, intended to adopt the British Rule. Such a bold departure from traditional practice would have surely drawn more explicit statutory language and legislative comment."); *see also New Prime II*, 398 F.3d at 1070 (reaching the same conclusion regarding § 14704(e)).

**[17]** Even the legislative history of § 14704(e) "is sparse," and is inconclusive as to Congress's intent. *New Prime*, 398 F.3d at 1070. As the Eighth Circuit concluded, the history does not support the position that Congress intended to adopt a "sea change" and mandate awards to prevailing defendants. *Id.*

**[18]** Because we read § 14704(e) to mandate an award of attorney's fees only to successful plaintiffs, we affirm the district court's denial of UPS's motion for attorney's fees.

**AFFIRMED.** Each party shall bear its own costs on appeal.